# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 19, 2021

Lyle W. Cayce
Clerk

No. 18-60251

Marisela Carolina Morales Lopez; Gretel Juliana
Mejia Morales,

*Petitioners*,

*versus*

Merrick Garland, U.S. Attorney General,

*Respondent*.

---

Petition for Review of an Order of the
Board of Immigration Appeals

---

Before Southwick, Graves, and Engelhardt, *Circuit Judges*.
James E. Graves, Jr., *Circuit Judge*:*

Marisela Carolina Morales Lopez and her minor daughter G.J.M.M.
are citizens of Honduras. They petition for review of the denial of their
asylum applications. We grant, in part, and deny, in part, the petition; vacate
the immigration judge's ("IJ") order of removal; and remand for further
proceedings consistent with this opinion.

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this
opinion should not be published and is not precedent except under the limited
circumstances set forth in 5th Circuit Rule 47.5.4.

No. 18-60251

## I.

Morales Lopez and her daughter were charged with illegally entering the United States. They conceded that they are removable and sought asylum. Their application[1] for asylum was denied.[2] The application presented two bases for relief. First, in February 2013, Morales Lopez was living with her husband Jose Carlos Mejia Murillo and children[3] when members of Los Olanchos—a gang—broke into Morales Lopez's home, beat Morales Lopez, and raped her repeatedly in front of her family. Second, in April or May 2015, members of Los Vatos Locos—another gang—tortured and murdered Morales Lopez's husband and then began threatening Morales Lopez and her family. The petition for review concerns only the incidents connected to Los Vatos Locos.

Los Vatos Locos first threatened Mejia Murillo in 2013 because he had an aunt who was a member of an opposing gang. Mejia Murillo was not involved in any gang himself. Although Mejia Murillo made efforts to avoid Los Vatos Locos, in April or May 2015, a third party lured him to an area where Los Vatos Locos members tortured and killed him. Community members who witnessed Mejia Murillo's death told Morales Lopez that Los Vatos Locos members "hit [Mejia Murillo] with pipes on his face and head, [] broke his knees open until you could see the bones; [] split his head open

---

[1] Morales Lopez's daughter is a derivative-asylum applicant. All references to Morales Lopez or her application pertain to her daughter's application as well. *See* 8 U.S.C. § 1158(b)(3)(A) ("A spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien.").

[2] Morales Lopez and her daughter had applied for additional relief that was denied but not at issue in their petition for review. *See Soadjede v. Ashcroft*, 324 F.3d 830, 833 (5th Cir. 2003) (deeming issues not raised in a petition for review abandoned).

[3] Morales Lopez has four children in total: three sons and one daughter.

2

and his face was so disfigured that he was unrecognizable. They also placed a rope around his neck and tied it to his hands behind his back and to his feet." Morales Lopez examined photos of Mejia Murillo's body and "saw that his head had been totally destroyed." She "could see his brain through a large crack in his skull." He was also shot six times. Morales Lopez did not report her husband's death to the police lest the police share that information with the gang, stating that, in Honduras, gang-related murders "cannot be reported" because "[t]he police will inform . . . the gang members[.]"

On the day of Mejia Murillo's burial—which was one or two days after his murder—Morales Lopez received a voicemail message from her husband's phone number. Los Vatos Locos' leader, an individual Morales Lopez refers to as "Abram," sent her the message, which was a recording of Mejia Murillo pleading with Los Vatos Locos members not to kill him because he had a wife and a daughter.

Two days later, Morales Lopez visited her mother-in-law's house with her children. Shortly after Morales Lopez left the house, three Los Vatos Locos members surrounded her. They told her that she was not allowed to "go there anymore" and had "three seconds to leave[.]"

Sometime the next week, Abram called Morales Lopez from Mejia Murillo's phone number and told her that "they would kill [her]." Abram said that "[Mejia Murillo] hadn't been killed because he still had his wife and daughter alive" and "everything from that dog would disappear,"[4] which Morales Lopez interpreted as a threat against her and her daughter, the only one of her children fathered by Mejia Murillo. Morales Lopez told Abram

---

[4] In her affidavit, Morales Lopez phrased Abram's statement somewhat differently, stating that Abram said that "everything that had to do with this dog would disappear."

that "[her] daughter didn't know anything and had nothing to do with this." Abram responded that "it didn't matter, that even his mother didn't matter to him." Abram then texted Morales Lopez—again from her husband's phone number—stating, "[W]hy are you afraid of us? Come to our neighborhood." Mejia Murillo's brother also received death threats from Abram following Mejia Murillo's murder.

A week or two after Mejia Murillo's murder, Los Vatos Locos members confronted Morales Lopez's son at his school, asking him where Morales Lopez was and forbidding him to return to the school. None of Morales Lopez's children returned to school that year.

Then, a few weeks to a month after Mejia Murillo's murder, Mejia Murillo's mother and brother abandoned their house at the direction of Los Vatos Locos members who implied that they would kill them if they did not leave the house within 72 hours of their order to vacate.[5]

In June 2015, Morales Lopez and her daughter moved in with Morales Lopez's cousin because of Los Vatos Locos' threats. Morales Lopez sent her sons to live with her sister because she thought it would be safer for them to live apart from her.

In January or February 2016, Morales Lopez saw a Los Vatos Locos gang member in a bus or car that was passing by her cousin's house. Later that same week, her cousin was attacked. The assailants "cut the side of his

---

[5] The IJ stated only that Mejia Murillo's mother and brother were ordered to leave the house in this incident. Morales Lopez's affidavit stated that Mejia Murillo's sister was also ordered to leave the house. But, when Morales Lopez testified, she did not mention Mejia Murillo's sister and, instead, mentioned her "mother-in-law and my brothers-in-law[.]" Like the IJ, Morales Lopez does not mention Mejia Murillo's sister in recounting the incident in her opening brief on review; Morales Lopez mentions only Mejia Murillo's mother and brother.

No. 18-60251

face with a machete and cut his wrist so badly that his tendons were cut and he could not move his fingers." Morales Lopez and her cousin suspected that Los Vatos Locos was behind the attack in part because her cousin "hadn't had any problems with gangs or anyone else[.]"

Soon after her cousin's attack, Morales Lopez left for the United States with her daughter. Morales Lopez's sons remained in Honduras with relatives.

In her asylum application, Morales Lopez claimed that she had suffered past persecution and had a well-founded fear of future persecution based on her membership in the particular social group of "immediate family members of Jose Carlos Mejia Murillo."[6] Morales Lopez testified at her removal hearing that she believes that she and her daughter would be tortured or killed by Los Vatos Locos if they returned to Honduras, and stated, "In Honduras, if they kill the husband, they also kill the wife." She recounted that, a few months before her husband's murder, Los Vatos Locos had killed her neighbor and, several months later, killed his wife. Morales Lopez stated that her sons are afraid to go outside and that she fears for their safety.

---

[6] After a detailed discussion, the IJ determined that "'immediate family members of Jose Carlos Mejia Murillo' constitutes a particular social group [under 8 U.S.C. § 1158(b)(1)(B)(i)], and that [Morales Lopez] is a member of such group by virtue of her common law marriage to [Mejia Murillo]." In *Pena Oseguera v. Barr*, the court remanded in part so that "the IJ and the BIA may have the benefit of the increased clarity provided by *Matter of L-E-A-*[, 27 I. & N. Dec. 581 (U.S. Att'y Gen. 2019)]." 936 F.3d 249, 251 (5th Cir. 2019). *Matter of L-E-A-* "stands for the proposition that families *may* qualify as social groups, but the decision must be reached on a case-by-case basis." *Id.* (emphasis in original). Unlike in *Pena Oseguera*, however, at no point did any party raise an issue with the IJ's finding that "immediate family members of Jose Carlos Mejia Murillo" constitutes a particular social group and that Morales Lopez is a member of that group. Thus, we do not reach the IJ's finding and do not remand in light of *Matter of L-E-A-*. (We note that the nexus test, *see infra*, is a separate inquiry from whether Mejia Murillo's immediate family constitutes a social group under § 1158(b)(1)(B)(i).)

5

No. 18-60251

Morales Lopez's fears were supported by her expert witness, Professor Mark Ungar, who testified that, if Morales Lopez is deported to Honduras, Los Vatos Locos would continue to target her. He stated that "one of the modus operandi of gangs is a very consistently long focus on targeting those that they have already attacked[;] family members, children of victims, . . . over a period of many years[,] continue[] to be intimidated and threatened by them." Ungar testified that Morales Lopez faces a 75 to 80 percent chance of being put in "serious danger for her life" by Los Vatos Locos if she is deported. Ungar stated that the Honduran police are unable or unwilling to protect those within their jurisdictions. Ungar also noted that it is "almost impossible" for a Honduran citizen to relocate within Honduras due to socioeconomic reasons and that Morales Lopez would be at a high risk of being killed by Los Vatos Locos even if she were to relocate to an area that Los Vatos Locos did not control.

The IJ determined that Morales Lopez and Ungar were credible witnesses. Nonetheless, the IJ concluded that Morales Lopez had not sufficiently shown that she had suffered past persecution or had a well-founded fear of future persecution. Accordingly, the IJ ordered that Morales Lopez and her daughter be removed to Honduras. The Board of Immigration Appeals ("BIA") adopted the IJ's decision and dismissed Morales Lopez's appeal. Morales Lopez timely filed a petition for review.

## II.

"Courts of appeals have exclusive jurisdiction to review final orders of removal." *Pena Oseguera v. Barr*, 936 F.3d 249, 250 (5th Cir. 2019) (citing 8 U.S.C. § 1252(a)(5)). Typically, this court reviews only the BIA's decision "unless the IJ's decision has some impact on the BIA's decision." *Wang v. Holder*, 569 F.3d 531, 536 (5th Cir. 2009); *see also id.* ("[T]his court may review the IJ's findings and conclusions if the BIA adopts them."). Here,

6

the BIA adopted the IJ's decision.  Thus, we may review IJ's decision.  *See Sealed Petitioner v. Sealed Respondent*, 829 F.3d 379, 383 (5th Cir. 2016).

We review legal conclusions de novo, giving deference to the BIA's or IJ's interpretation of any ambiguous immigration statutes, and factual findings for substantial evidence.  *Orellana-Monson v. Holder*, 685 F.3d 511, 517–18 (5th Cir. 2012) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)).  Substantial evidence supports a finding when the finding is "based on the evidence presented" and is "substantially reasonable."  *Id.*  We may not reverse a finding unless "the evidence was so compelling that no reasonable factfinder could conclude against it."  *Wang*, 569 F.3d at 537; *see also* 8 U.S.C. § 1252(b)(4)(B) ("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary[.]").  The petitioner carries the burden to demonstrate that the evidence compels a contrary conclusion, *Zhao v. Gonzales*, 404 F.3d 295, 306 (5th Cir. 2005), and must show this by a preponderance of the evidence.  *Calel-Chitic v. Holder*, 333 F. App'x 845, 846 & n.6 (5th Cir. 2009); *see also, e.g.*, *Gomes v. Gonzales*, 473 F.3d 746, 753 (7th Cir. 2007) ("An applicant for asylum bears the burden of proving by a preponderance of the evidence that she qualifies as a 'refugee' as defined by the statute.").  In any case, "[i]t is the factfinder's duty to make credibility determinations, and this court cannot substitute its judgment for that of the BIA or IJ with respect to witnesses' credibility."  *Orellana-Monson*, 685 F.3d at 518.

"The Secretary of Homeland Security or the Attorney General may grant asylum . . . to refugee[s.]"  8 U.S.C. § 1158(b)(1)(A).  In relevant part, a refugee is a person who is outside of his or her country of nationality and "is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality,

membership in a particular social group, or political opinion[.]" *Id.* § 1101(a)(42)(A). An applicant is not entitled to asylum unless the individual can show "a nexus," *Pena Oseguera*, 936 F.3d at 250, i.e., that his or her "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." *Id.* § 1158(b)(1)(B)(i).

"Persecution" is "[t]he infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive (*e.g.*, race, religion, political opinion, etc.), in a manner condemned by civilized governments." *Abdel-Masieh v. I.N.S.*, 73 F.3d 579, 583 (5th Cir. 1996) (internal quotation marks and citation omitted). "The harm or suffering need not be physical, but may take other forms, such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life." *Id.* (internal quotation marks and citation omitted); *see also Morales v. Sessions*, 860 F.3d 812, 816 (5th Cir. 2017) ("Examples of persecution include, but are not limited to, threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom.") (internal quotation marks and citation omitted). Nonetheless, a showing of persecution "generally requires more than a few isolated incidents of verbal harassment or intimidation." *Morales*, 860 F.3d at 816 (internal quotation marks and citation omitted).

If an asylum applicant sufficiently establishes past persecution, he or she is entitled to a rebuttable presumption of a well-founded fear of future persecution, unless the applicant's fear of future persecution is unrelated to his or her past persecution. 8 C.F.R. § 208.13(b)(1).

To show a well-founded fear of persecution, the applicant "must show that a reasonable person in the same circumstances would fear persecution if

deported." *Orellana-Monson*, 685 F.3d at 518 (internal quotation marks and citation omitted). "The subjective fear of future persecution must be objectively reasonable." *Id.* A "reasonable degree" can mean a ten percent chance. *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446, 440 (1987) ("[O]ne of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees[.] . . . There is simply no room in the United Nations' definition for concluding that because an applicant only has a 10% chance of being shot, tortured, or otherwise persecuted, that he or she has no 'well-founded fear' of the event happening."); *see also id.* at 431 ("That the fear must be 'well-founded' does not alter the obvious focus on the individual's subjective beliefs, nor does it transform the standard into a 'more likely than not' one. One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place."). In other words, "so long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility." *Id.* at 440 (internal quotation marks and citation omitted).

To show his or her fear is objectively reasonable, an applicant must establish that:

> (1) he possesses a belief or characteristic a persecutor seeks to overcome by means of punishment of some sort; (2) the persecutor is already aware, or could become aware, that the alien possesses this belief or characteristic; (3) the persecutor has the capability of punishing the alien; and[] (4) the persecutor has the inclination to punish the alien.

*Eduard v. Ashcroft*, 379 F.3d 182, 191 (5th Cir. 1995) (citing *In re Mogharrabi*, 19 I. & N. Dec. 439, 446 (BIA 1987)).

No. 18-60251

The applicant must present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution because he or she differs in a way regarded as offensive (e.g., race, religion, political opinion, membership in a particular social group etc.). *Zhao*, 404 F.3d at 307. However, an IJ "shall not require" an applicant to provide evidence that he or she would be singled out if:

> (A) The applicant establishes that there is a pattern or practice in his or her country of nationality . . . of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

> (B) The applicant establishes his or her own inclusion in, and identification with, such group of persons such that his or her fear of persecution upon return is reasonable.

8 C.F.R. § 208.13(b)(2)(iii); *see also Zhao*, 404 F.3d at 307 ("There are therefore two different ways for Zhao to prove the objectivity of his persecution claim. First, he can show that he would be singled out for persecution. Alternately, he can satisfy the two prongs of § 208.13(b)(2)(iii).").

## III.

Morales Lopez argues that the IJ improperly determined that she did not make a sufficient showing of past persecution and a well-founded fear of future persecution. Regarding past persecution, Morales Lopez argues that the IJ erroneously (1) required each incident of harm to rise to the level of persecution, (2) failed to consider all relevant incidents of harm, (3) required a showing of physical harm, and (4) failed to consider significant liberty deprivations suffered by Morales Lopez and her children. Morales Lopez further argues that (5) the substantial evidence compels a finding of past

persecution and (6) the IJ erred by failing to consider Morales Lopez's psychological harm.

Regarding a well-founded fear of future persecution, Morales Lopez argues that the IJ erroneously (1) applied a preponderance-of-the-evidence standard instead of a reasonable-possibility standard; (2) failed to evaluate Morales Lopez's fear of future persecution using the four-part test set forth in *In re Mogharrabi*; (3) conflated the past-persecution and well-founded-fear-of-future persecution analyses, (4) required Morales Lopez to offer direct proof of her persecutors' motives, and (5) mischaracterized Ungar's testimony. Morales Lopez further argues that (6) the substantial evidence compels a finding of a well-founded fear of future persecution.

Although we neither agree with nor reach all of Morales Lopez's arguments, we agree with her overarching point: the IJ and the BIA improperly determined that Morales Lopez did not make a sufficient showing of past persecution and a well-founded fear of future persecution. We address Morales Lopez's arguments in turn.

A.

We summarize the relevant portions of the IJ's and the BIA's decisions as they relate to Morales Lopez's past-persecution claim. The IJ identified four incidents as the bases for Morales Lopez's claim:

> (1) on the day her husband was buried, she received a voicemail from her husband's phone number consisting of a recording of the Vatos Locos beating her husband before they murdered him; (2) the week of her husband's burial, three members of the Vatos Locos surrounded her as she was leaving her mother-in-law's home and told her that "the 'tio'[7] didn't want to see [her] there anymore"; (3) about a week after her husband's

---

[7] The "tio" is Abram.

death, the "tio" called her from her husband's phone and said, "everything that had to do with this dog would disappear"; and (4) she received a text message from her husband's phone that read, "why are you afraid of us?  Come to our neighborhood."

The IJ stated that "[n]one of these incidents are explicit death threats" but that "[Morales Lopez] interpreted the first and third incidents as threats that the Vatos Locos intended to kill her and [her daughter]."  The IJ discounted the second and fourth incidents, stating that their "meaning . . . is uncertain, partly because [Morales Lopez] did not clarify in which neighborhood . . . each incident occurred and over which neighborhood the Vatos Locos had control."

Although the IJ highlighted the four incidents above, he discussed other incidents as well, focusing on the location where each incident occurred or might have occurred and whether Los Vatos Locos had control over these different areas.[8]

The IJ stated, "there are too many unanswered questions to conclude that the threats [Morales Lopez] received from the Vatos Locos constitute past persecution."  The "unanswered questions" that the IJ referenced

---

[8] The IJ stated, "Neither [Morales Lopez's] testimony nor her affidavit clarify whether the neighborhood over which the Vatos Locos had control was . . . where [Mejia Murillo] was murdered; . . . where the [third party] who picked [Mejia Murillo] up[, leading him to his death,] may have lived; . . . where [Mejia Murillo] began receiving threats from the Vatos Locos; or another neighborhood entirely."  The IJ speculated that "members of the Vatos Locos may have told [Morales Lopez] they 'didn't want to see [her] there anymore' as she was leaving her mother-in-law's house because they controlled [the neighborhood]," and that "[t]he text message inviting [Morales Lopez] to 'come to our neighborhood' could have indicated that she should come to [a neighborhood that Los Vatos Locos controlled]."  Regarding Morales Lopez's son's encounter with Los Vatos Locos members outside his school, the IJ stated that the school was in Los Vatos Locos territory.

appear to regard the location of the incidents; Los Vatos Locos' control of those locations; and whether the threats against Morales Lopez were death threats because, in the IJ's view, they were not "explicit death threats." The IJ further reasoned that "the Vatos Locos never personally attacked or physically harmed [Morales Lopez]." He stated, "Without a sufficient explanation of the details of each encounter with the Vatos Locos and of the connection between all four incidents, [Morales Lopez] has left the Court with too much ambiguity to conclude that the threats she received amount to past persecution."

On appeal, the BIA adopted the IJ's decision in full and also added: "We note that [Morales Lopez] began to receive threats from Los Vatos Locos as early as May 2015, when [Mejia Murillo] was murdered; yet, she and [her daughter] remained unharmed before leaving Honduras in February 2016."

1.

Morales Lopez first argues that the IJ improperly required that each incident of harm rise to the level of persecution. *See Lin v. Holder*, 478 F. App'x 219, 227 (5th Cir. 2012) ("An applicant may establish past persecution on the basis of the cumulative effects of multiple incidents even if each incident, considered in isolation, would not rise to the level of persecution.") (citing *Eduard*, 379 F.3d at 188). Morales Lopez has effectively forfeited this argument.

Morales Lopez does not flesh out her argument that the IJ analyzed separate incidents independently; she simply recounts the IJ's reasoning for finding that she did not sufficiently establish past persecution.[9] But it is not

---

[9] Morales Lopez appears to conflate her aggregation argument with her related argument that the IJ did not consider all relevant incidents of harm.

clear from the plain language of the IJ's decision that he analyzed the incidents he considered separately from one another. In other words, Morales Lopez does not connect her argument to the IJ's decision. *Cf. In re HECI Expl. Co., Inc.*, 862 F.2d 513, 525 (5th Cir. 1988) (declining to address an issue that was listed in a brief but not otherwise argued or adequately briefed); *Eduard*, 379 F.3d at 188 (finding no error where the petitioners did not carry their burden to prove that the IJ analyzed each incident independently rather than in the aggregate). For these reasons, Morales Lopez has effectively forfeited her argument.

2.

Second, Morales Lopez argues that the IJ did not consider all relevant incidents of harm. We agree. The IJ is not required to "address evidentiary minutiae or write any lengthy exegesis, [but] its decision must reflect meaningful consideration of the relevant substantial evidence supporting the alien's claims." *Abdel-Masieh*, 73 F.3d at 585 (citation omitted). And the BIA's failure to consider relevant substantial evidence is a "fail[ure] to comply with its responsibilities." *Sanon v. I.N.S.*, 52 F.3d 648, 652 (7th Cir. 1995).

In *Abdel-Masieh*, the BIA decided that Abdel did not have a well-founded fear of persecution based on the fact that "unidentified people were asking questions about [him] at his former work place." 73 F.3d at 585. The BIA made no mention of Abdel's testimony regarding the firing of his mother, the beating and questioning of his brother, or the appearance of Abdel's name on a "wanted" list at the airport. *Id.* The court held that the BIA had failed to "expressly address the relevant conditions . . . and the experiences of Abdel's family members and co-workers." *Id.* The court considered this a failure of the agency to comply with its responsibilities and

14

held that the court should "insist on its compliance rather than attempt to supplement its efforts." *Id.* (quoting *Sanon*, 52 F.3d at 652).

Similarly, the IJ in this case did not meaningfully consider all relevant substantial evidence supporting Morales Lopez's past persecution claim. First, the IJ's consideration of past persecution does not include incidents involving Mejia Murillo's relatives. Specifically, omitted from the IJ's analysis are that, after Mejia Murillo's death, (1) Mejia Murillo's brother received death threats from Abram, and (2) Los Vatos Locos members ordered Mejia Murillo's brother and mother to abandon their home, threatening by implication that they would be murdered if they did not leave.

Threats of violence and housing deprivation against family members can support a finding of persecution so long as they are coupled with threats made directly to the petitioner. *See, e.g.*, *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 349 (5th Cir. 2006) (concluding that the record compelled a finding of persecution where it included, among other things, "threats of violence and acts of vandalism" against the asylum applicant's family by members of the persecuting group); *see also Abdel-Masieh*, 73 F.3d at 583 (concluding that the suffering or harm necessary to a finding of persecution can include "deprivation of liberty, food, housing, employment or other essentials of life") (internal quotation marks and citation omitted). By omitting the incidents involving Morales Lopez's in-laws, the IJ failed to meaningfully consider all relevant substantial evidence supporting Morales Lopez's past persecution claim.

Second, the IJ omitted probative parts of Morales Lopez's phone call with Los Vatos Locos' leader. Although the IJ stated that Abram told Morales Lopez that "everything that had to do with this dog would disappear," Abram also told Morales Lopez that "[Mejia Murillo] hadn't been killed because he still had his wife and daughter alive" and that "they

would kill [her]," an explicit death threat.  Further, when Morales Lopez told Abram that "[her] daughter didn't know anything and had nothing to do with this," Abram responded that "it didn't matter, that even his mother didn't matter to him," making the death threat implicit in "everything that had to do with this dog would disappear" even clearer.  By omitting these statements, the IJ again failed to meaningfully consider all relevant substantial evidence supporting Morales Lopez's past persecution claim.  The omission of these statements is particularly noteworthy because the IJ determined that none of the incidents he analyzed "are explicit death threats."  This determination supported the IJ's finding that Morales Lopez had not shown past persecution.  At least one of the omitted statements—that Abram told Mejia Murillo that "they would kill [her]"—directly contradicts the IJ's analysis.

Third, the IJ omitted that Los Vatos Locos members who had confronted Morales Lopez's son, telling him not to return to school, had asked him about Morales Lopez's whereabouts.  Instead, the IJ stated only that "members of the Vatos Locos came to [Morales Lopez's] son['s] school and told him he could no longer attend that school because the school was in 'their neighborhood.'"

Morales Lopez correctly argues that probative evidence includes threats the petitioner believes were aimed *at* her, not just threats made *to* her.  *See, e.g.*, *Tamara-Gomez*, 447 F.3d at 348–49.  While the Los Vatos Locos members' inquiry as to Morales Lopez's whereabouts might not sufficiently evidence past persecution on its own, it is relevant to a showing of past persecution when read in relation to the other incidents.  *See Lin*, 478 F. App'x at 227.  Accordingly, by omitting the inquiry, the IJ did not meaningfully consider all relevant substantial evidence supporting Morales Lopez's past persecution claim.

Ultimately, the IJ erred by failing to meaningfully consider all the relevant substantial evidence in support of Morales Lopez's past persecution claim.[10]

3.

Third, Morales Lopez argues that the IJ erred by requiring her to substantiate her past persecution claim with evidence of physical harm. We disagree.

The IJ stated that, although "[p]ersecution includes rape, physical abuse, and physical attacks[,] . . . [d]eath threats may also qualify as persecution if they are immediate, menacing, or the perpetrators attempt to follow up on them." *See Qorane v. Barr*, 919 F.3d 904, 910 (5th Cir. 2019) ("[E]ven assuming threats can constitute past persecution, threats that are exaggerated, non-specific, or lacking in immediacy should not suffice.") (internal quotation marks and citation omitted); *cf. Morales*, 860 F.3d at 816 ("Examples of persecution include, but are not limited to, threats to life[.]").

It is true that the IJ concluded, in part, "[T]he Vatos Locos never personally attacked or physically harmed [Morales Lopez]." But that was

---

[10] Morales Lopez also argues, "Notably absent from the IJ's consideration is the Vatos Locos' act of recording [Mejia Murillo's] torture prior to his death." But the IJ considered the following incident: "on the day her husband was buried, [Morales Lopez] received a voicemail from her husband's phone number consisting of a recording of the Vatos Locos beating her husband before they murdered him." Morales Lopez appears to argue that the IJ should have considered not only that Morales Lopez received a voicemail of the recording, but also that the recording was made in the first place. This argument splits hairs. Morales Lopez does not explain how a recording made but never sent can be a threat: no one would ever know about it. In other words, it is the fact that Morales Lopez received (and, thus, was sent) the recording that appears to matter here. What also matters is the content and context of the recording. The IJ considered the receipt of the recording and its content and context, and Morales Lopez does not argue otherwise. Accordingly, that the IJ did not consider Los Vatos Locos' act of making the recording is unavailing.

No. 18-60251

not the beginning and end of the IJ's analysis. While the IJ did not consider all relevant substantial evidence, it appears that he analyzed whether the threats that he did consider were immediate, menacing, or the perpetrators attempted to follow up on them.[11] In other words, it does not appear that the IJ required a showing of physical harm, contrary to Morales Lopez's contention.

4.

Fourth, Morales Lopez argues that the IJ erred by failing to consider the liberty deprivations she and her children faced because of Los Vatos Locos' actions. Specifically, Morales Lopez argues that Los Vatos Locos' actions forced her and her children to relocate, prevented her children from attending school, and caused her to separate herself from most of her children. *See Abdel-Masieh*, 73 F.3d at 583. We lack jurisdiction to consider this argument.

Morales Lopez failed to exhaust her administrative remedies as to this issue because she did not raise the issue before the BIA, either on direct appeal or in a motion to reopen. *See Heaven v. Gonzales*, 473 F.3d 167, 177

---

[11] The IJ stated:

Without a sufficient explanation of the details of each encounter with the Vatos Locos and of the connection between all four incidents, [Morales Lopez] has left the Court with too much ambiguity to conclude that the threats she received amount to past persecution. *Compare Hernandez-Baena* [*v. Gonzalez*], 417 F.3d [720,] 723 [(7th Cir. 2005)] (finding that a verbal death threat over the phone was not "of a sufficiently immediate and menacing nature as to constitute, without more, persecution"), *with Tamara-Gomez*, 447 F.3d at 346 (finding past persecution where those who threatened the applicant also threatened to kill the applicant's family members and murdered other individuals similarly situated to the applicant).

Morales Lopez does not address this language.

No. 18-60251

(5th Cir. 2006); 8 U.S.C. § 1252(d) ("A court may review a final order of removal only if . . . (1) the alien has exhausted all administrative remedies available to the alien as of right, and (2) another court has not decided the validity of the order[.]"); *see also Omari v. Holder*, 562 F.3d 314, 322–23 (5th Cir. 2009) (concluding that, for purposes of exhaustion, petitioners must make "some concrete statement before the BIA to which they could reasonably tie their claims before this court").  Since exhaustion in this context is a statutory mandate, Morales Lopez's failure to exhaust the issue deprives us of jurisdiction over it.  *See Wang v. Ashcroft*, 260 F.3d 448, 452 (5th Cir. 2001); *see also Said v. Gonzales*, 488 F.3d 668, 670–71 (5th Cir. 2007) (concluding that we must raise jurisdictional issues sua sponte, if necessary).

5.

Fifth, Morales Lopez argues that the relevant substantial evidence, when considered together, compels a finding of past persecution.  We agree.

Our court's decision in *Tamara-Gomez* is illuminating.  There, the IJ denied Tamara-Gomez's asylum application, which claimed past persecution and a well-founded fear of future persecution, and the BIA affirmed.  *Tamara-Gomez*, 447 F.3d at 345.  Underlying Tamara-Gomez's claims were these facts: Tamara-Gomez noticed men filming him as he and Colombian National Police ("CNP") officers were completing a mission in July 2001.  *Tamara-Gomez*, 447 F.3d at 345–46.  CNP officers captured one of the men who was filming the mission, a member of Fuerzas Armadas Revolucionarias de Colombia ("FARC").  *Id.* at 346.  The FARC member turned to Tamara-Gomez and shouted, "We know who you are," and, "You will suffer retaliation."  *Id.* (internal quotation marks omitted).

About one month after the incident, Tamara-Gomez began to receive threatening calls, specifically mentioning the mission, on his personal cell phone.  *Id.*  The callers identified Tamara-Gomez's family and began calling

19

Tamara-Gomez's home, threatening Tamara-Gomez and his family. *Id.* Tamara-Gomez asked the CNP for protection but was told that the CNP could not protect him and his family. *Id.*

Subsequently, Tamara-Gomez and his family moved to another house, but the threatening phone calls resumed within weeks. *Id.* Tamara-Gomez's wife also received "demands for money, death threats to her husband, and threats to kidnap her two sons and train them to fight for FARC." *Id.* The actors making the threats and demands identified themselves as FARC members. *Id.*

Then, in January 2002, "a bicycle bomb exploded in [ ] Tamara-Gomez's new neighborhood, killing five (none of the victims were members of Tamara-Gomez's family)." *Id.* After this incident, in March 2002, Tamara-Gomez sent his wife and children to Florida on visas obtained prior to the FARC threats. *Id.* At some point between March 2002 and late summer 2002, Tamara-Gomez "learned that FARC had tracked down and murdered other participants (or the family members of participants) in the June 2001" mission. *Id.* Believing his life was in danger, Tamara-Gomez entered the United States on a visitor's visa on July 24, 2002. *Id.* A few weeks after his departure, a vandal broke into Tamara-Gomez's home and spray painted the words "Sapa Regaldo," which means "Two-Bit Snitch," and the letters "FARC." *Id.*

Despite the evidence above, the IJ determined that Tamara-Gomez was ineligible for asylum because he failed to demonstrate past persecution or a well-founded fear of future persecution. *See id.* at 348. On review, this court concluded that the IJ, whose decision the BIA affirmed in its entirety, "discarded all evidence of persecution" even though the IJ found Tamara-

No. 18-60251

Gomez credible and ostensibly "accept[ed] his account" of the facts.[12]  *Id.*
(internal quotation marks omitted).  The court reconsidered the evidence,
stating:

> When we consider the evidence as a whole, which the IJ
> apparently failed to do, we find that Tamara-Gomez has made
> a compelling case of persecution.  Based on the documentary
> evidence, the well-supported testimony of Tamara-Gomez that
> was specifically found by the IJ to be credible, the threats of
> violence and acts of vandalism against Tamara-Gomez and his
> family by persons identified as members of FARC, and the fact
> that the violent threats against other participants of the same
> helicopter mission were carried out, a "reasonable
> adjudicator" would be "compelled" to find that Tamara-
> Gomez had been persecuted or had a "well founded fear of
> future harm."  Consequently, the IJ's finding to the contrary
> was error.

*Id.* at 348–49 (footnotes omitted).

As in *Tamara-Gomez*, the IJ here did not consider the evidence as a
whole.  A reasonable adjudicator would be compelled to find that Morales
Lopez had been persecuted based on Los Vatos Locos' murdering Morales
Lopez's husband after the gang threatened and harassed him over the span

---

[12] The *Tamara-Gomez* court described the IJ's analysis of the evidence:

> Specifically, the IJ dealt with the evidence as follows:
> First, the IJ found the "bomb incident" to be "a random
> act of violence all too common in Colombia and unrelated
> to the respondent or his wife."  Second, the IJ found that
> the "home invasion . . . may have been a purely criminal
> act against a target of opportunity."  Third, the IJ
> dismissed the threatening phone calls by finding that "it
> was far from clear whether they were serious or the acts
> of persons who enjoy terrorizing their neighbors."

*Tamara-Gomez*, 447 F.3d at 348 n.6.

of two years; the multiple and varied menacing threats of harm against Morales Lopez and her family by Los Vatos Locos members following Mejia Murillo's death, including an explicit death threat to Morales Lopez; the brutal attack on Morales Lopez's cousin soon after Morales Lopez sighted a Los Vatos Locos member in her cousin's neighborhood; and the credited expert testimony that gangs in Honduras such as Los Vatos Locos persistently target and then kill the family members of their victims regardless of gang territorial lines, and that Morales Lopez faces a 75 to 80 percent chance of being put in "serious danger for her life" by Los Vatos Locos if she is deported. *Cf. Hernandez-Baena v. Gonzales*, 417 F.3d 720, 723 (7th Cir. 2005) (concluding that applicant who "supplied no evidence that the use of the term 'death sentence' by the person who telephoned his office in Pereira had significance as anything other than a verbal threat," and who "remained in Pereira for seven months after the threatening call without experiencing any further harm or threat of harm," did not experience a threat that was "sufficiently immediate and menacing . . . as to constitute, without more, persecution.").

Disregarding relevant substantial evidence, the IJ and the BIA prematurely foreclosed Morales Lopez's past-persecution claim. The reasoning they employed bears consideration. First, the IJ appeared to place heavy weight on his view that Morales Lopez was not explicitly threatened with death. Second, the IJ also appeared to place heavy weight on the fact that it is unclear where many of the incidents occurred and whether the incidents occurred in Los Vatos Locos territory. Third, the IJ reasoned that "the Vatos Locos never personally attacked or physically harmed [Morales Lopez]." The BIA reflected this reasoning when it noted that Los Vatos Locos first threatened Morales Lopez nine to ten months before she fled Honduras and that, at no point during that time, was she or her daughter physically harmed. Fourth, the IJ discounted Morales Lopez's failed efforts

to escape Los Vatos Locos by moving in with her cousin.[13]  Specifically, the IJ did not fully credit Morales Lopez's account that she spotted a Los Vatos Locos member in her cousin's neighborhood and that Los Vatos Locos was behind her cousin's attack.  Further, the BIA's focus on the time between when Morales Lopez received threats and when she fled Honduras ignores that Morales Lopez made efforts to escape Los Vatos Locos.  We address each point in turn.

First, contrary to the IJ's determination, Abram explicitly threatened Morales Lopez with death.  *See supra*.  Second, the IJ's own summary of Ungar's testimony undermines the relevance of Los Vatos Locos' territorial lines:

> Professor Ungar . . . explained that "one of the modus operandi of gangs is a very consistently long focus on targeting those that they have already attacked."  [Morales Lopez's] "level of threat continues" even if she "move[s] to another part[] of the country, [or] return[s] after many [sic] many years" because "family networks, knowledge of families, community, peoples' knowledge of each other doesn't change that much."  Therefore, [Morales Lopez's] "presence [would] become[] well-known" if she were to return, and "the threats [might] coalesce back into place."  Professor Ungar concluded that [Morales Lopez] will face a 75 to 80 percent chance of "be[ing] in serious danger for her life" if she returns to Honduras.
>
> . . .
>
> [Ungar] explained that these gangs
>
>> have very close coordination networks. . . . [T]hey know who moves around the country. . . . [T]hey have an affiliate or a connection in

---

[13] While the IJ discussed this incident in his well-founded-fear-of-future-persecution analysis, the incident is relevant to Morales Lopez's past-persecution claim.

> another part of the country who will alert them
> to the presence of this person.  This also goes
> through Central America[.]  [W]hen people flee,
> their whereabouts are often known outside the
> country.

> Therefore, the gangs likely would have been able to track
> [Morales Lopez's] whereabouts.  If she were returned to
> Honduras, [Morales Lopez] would "most likely" suffer from
> "rape, torture, assault, intimidation, and . . . a very [sic]
> likelihood of homicide . . . because of the pattern that [the
> gangs] have already established against her and her family."

The IJ found Ungar's testimony credible, and there is no evidence in the record contradicting his testimony.  The evidence shows that the mere fact of territorial lines would not protect an individual from Los Vatos Locos.  As the IJ stated, Mejia Murillo was lured from the Felipe Celaya neighborhood, where he lived, to the Rivera Hernandez neighborhood, where he was killed.

Third, the IJ reasoned that "the Vatos Locos never personally attacked or physically harmed [Morales Lopez]."  Although the BIA adopted the IJ's analysis, it also added: "We note that [Morales Lopez] began to receive threats from Los Vatos Locos as early as May 2015, when [Mejia Murillo] was murdered; yet, she and [her daughter] remained unharmed before leaving Honduras in February 2016."  However, as the IJ stated, Mejia Murillo began receiving threats from Los Vatos Locos two years before he was murdered.  That Morales Lopez or her daughter was not murdered or otherwise physically harmed in the nine or ten months between May 2015 and February 2016 is not probative of past persecution.  *See Abdel-Masieh*, 73 F.3d at 583 (including in the definition of "persecution" "[t]he infliction of

suffering or harm" and stating that "[t]he harm or suffering need not be physical") (internal quotation marks and citation omitted).

Fourth, the IJ discounted the fact that Morales Lopez's efforts to escape Los Vatos Locos ultimately failed. Similarly, the BIA's focus on the time between when Morales Lopez received threats and when she fled Honduras ignores that Morales Lopez made efforts to escape Los Vatos Locos.

In June 2015, Morales Lopez left her sons in the care of her sister, thinking that they would be safer if they stayed apart from her and her daughter, who Los Vatos Locos had threatened to kill. At the same time, Morales Lopez and her daughter moved in with Morales Lopez's cousin in a neighborhood different from her sister's. Morales Lopez's affidavit stated that, in late January or early February 2016, Morales Lopez saw a car in her cousin's neighborhood "that was being driven by one of the men that had killed [her] husband. [She] was very scared, because this was a private neighborhood, not a thoroughfare, so [she] felt that he was out looking for [them]." However, Morales Lopez recounted the incident somewhat differently in her removal-hearing testimony, stating that she "was behind [her] cousin's house [when she] saw a bus go by and . . . saw one of the gang members."

Notably, quoting Morales Lopez's psychological assessment, the IJ stated: "[Morales Lopez] may have difficulty accessing specific details of the trauma she has suffered due to her [post-traumatic stress disorder] diagnosis. These symptoms substantiate rather than undermine, the credibility of her

account of traumatic experience."    And the IJ found Morales Lopez "credible" without qualification.[14]

Within a week of seeing the Los Vatos Locos member in her neighborhood, Morales Lopez's "cousin was attacked by unknown assailants.  They cut the side of his face with a machete and cut his wrist so badly that his tendons were cut and he could not move his fingers."  Morales Lopez's cousin "hadn't had any problems with gangs or anyone else, so [Morales Lopez and her cousin] suspected that it was people who were after [Morales Lopez] and [her] family.  [Morales Lopez's] cousin told [Morales Lopez] that he would be unable to continue to protect [her] [sic] that [they] should all flee[.]"

The IJ found Morales Lopez's account of seeing a Los Vatos Locos member in a car or bus "somewhat implausible," reasoning:

> First, [Morales Lopez] did not explain how she would have been able to identify a passenger on a moving bus or the driver of a moving car from behind her cousin's house.  Unless [Morales Lopez] was close to the street and the car or bus was moving slowly, the Court does not understand how she would have been able to identify her husband's assailant.  Second, [Morales Lopez] never even established which gang member killed her husband and how she would have known who killed him.  The Court found her testimony regarding the murder of her husband credible, but notes that she never identified her husband's killer clearly enough for the Court to be persuaded that she was able to identify him from inside a moving vehicle.

---

[14] While the IJ noted, for example, that "[Morales Lopez] did not always specify the area in which a particular incident occurred," this did not affect his credibility finding.

"It is the factfinder's duty to make determinations based on the credibility of the witnesses." *Zhang v. Gonzales*, 432 F.3d 339, 344 (5th Cir. 2005) (internal quotation marks, brackets, and citation omitted). "Still, an adverse credibility determination must be supported by specific and cogent reasons derived from the record." *Id.* (collecting cases). Again, the IJ here explicitly found Morales Lopez credible, devoting a section of his decision to a discussion of her credibility. It is not clear why the IJ would find that Morales Lopez is credible and then seemingly backtrack as to one incident later in his decision. It is not implausible that Morales Lopez would be able to identify a Los Vatos Locos member who passed by her in a car or bus, as the IJ himself noted: "Unless [Morales Lopez] was close to the street and the car or bus was moving slowly, the Court does not understand how she would have been able to identify her husband's assailant." The IJ merely speculated that Morales Lopez could not have seen any person in a passing car or bus. In other words, the IJ's determination that it was "somewhat implausible" for Morales Lopez to see a Los Vatos Locos member in the circumstances she described is not supported "by specific and cogent reasons derived from the record." *See Zhang*, 432 F.3d at 344.

Further, although Morales Lopez's affidavit stated that Morales Lopez saw "one of the men that had killed [her] husband," Morales Lopez testified that she "saw one of the gang members." The IJ does not address Morales Lopez's testimony statement and focuses only on her affidavit statement. It is not implausible that Morales Lopez would refer to any Los Vatos Locos member as a person who had killed her husband. Again, the IJ's "somewhat implausible" determination as to Morales Lopez's account is not supported by specific and cogent reasons derived from the record, particularly following the IJ's finding that Morales Lopez is credible. *Cf. Zhao*, 404 F.3d at 310 ("The IJ credited all of Zhao's testimony but

interpreted it in such a way that allowed her to rule against him on grounds of legal sufficiency.").

In any case, the IJ discounted Morales Lopez's testimony that the men who attacked her cousin were Los Vatos Locos members, stating that "the documentary evidence shows that no Honduran is safe from violent crime." The IJ in *Tamara-Gomez* made a similar determination regarding the bike bomb in that case. 447 F.3d at 348 n.6 ("[T]he IJ found the 'bomb incident' to be 'a random act of violence all too common in Colombia and unrelated to the respondent or his wife.'"). However, the *Tamara-Gomez* court concluded, "Considered in isolation the bike bomb may in fact have been a 'random act of violence.' Yet, in the light of the other occurrences it is not unreasonable to believe that the bomb was targeted at Tamara-Gomez and/or his family." *Id.* at 348 n.7. The same is true here. Given the other incidents, it is not unreasonable to believe that the attack on Morales Lopez's cousin was perpetrated by Los Vatos Locos.

Ultimately, the relevant substantial evidence—when considered as a whole—compels a finding of past persecution.

6.

Sixth, Morales Lopez argues that the IJ erred by failing to consider the psychological harm she suffered. Morales Lopez received a psychological assessment showing that she suffers from post-traumatic stress disorder because of "her experience of being raped, the killings of her partners and her own experience of being threatened with death by gang members in Honduras."[15] It is not clear, however, whether the IJ's omission of psychological harm is error. *See, e.g.*, *Karanja v. Keisler*, 251 F. App'x 891,

---

[15] Two of Morales Lopez's partners prior to her relationship to Mejia Murillo had been killed in incidents that Morales Lopez does not connect to Los Vatos Locos.

No. 18-60251

892 (5th Cir. 2007) (noting a lack of authority concluding that emotional distress is a type of harm that constitutes past persecution); *cf.* Scott Rempell, *Defining Persecution*, 2013 UTAH L. REV. 283, 297 (2013) (arguing that "psychological harms should be recognized as a distinct component of a persecution analysis"). Morales Lopez does not rely on any binding authority that supports her argument that psychological harm may qualify as past persecution.[16] We need not resolve this question, however, because the other evidence discussed above compels a finding of past persecution.

B.

Turning to Morales Lopez's well-founded fear of future persecution claim, we summarize the relevant portions of the IJ's and the BIA's decisions.

The IJ did not dispute Morales Lopez's subjective fear of future persecution if she were deported to Honduras.[17] However, the IJ determined that Morales Lopez failed to establish that her fear was objectively reasonable. The IJ stated, "As previously explained, the threats [Morales Lopez] personally received were too vague to qualify as past persecution." The BIA echoed this reasoning in its decision, stating, "The [IJ] properly found that [Morales Lopez] presented insufficient evidence that she

---

[16] Morales Lopez relies on *In re A-K-*, a BIA decision, which states that past persecution can be established "where a person persecutes someone close to an applicant, such as a spouse, parent, child or other relative, with the intended purposes of causing emotional harm to the applicant, but does not directly harm the applicant himself." 24 I. & N. Dec. 275, 278 (BIA 2007).

[17] The IJ did not explicitly state that Morales Lopez established a subjective fear of future harm, but he effectively stated as much: "The Court understands that [Morales Lopez] fears the Vatos Locos will subject her to further threats and physical harm because of her relationship with [Mejia Murillo] if she returns to Honduras." The BIA, which adopted the IJ's decision, more explicitly stated the same: "[Morales Lopez] has established that she has a subjective fear of future harm in Honduras[.]"

specifically would be targeted for persecution . . . . As discussed above, [Morales Lopez's] past experiences with Vatos Locos gang does [sic] not amount to persecution."

The IJ further determined that the "descriptions of the incidents involving other members of [Mejia Murillo's] family lacked detail." In particular, the IJ discussed four incidents. First, Mejia Murillo's brother received what Morales Lopez described as "death threats" from Los Vatos Locos' leader following Mejia Murillo's death. The IJ discounted the threats because "[Morales Lopez] never explained what the threat to [Mejia Murillo's brother] entailed or how it was connected to [Mejia Murillo]."

Second, a few weeks to a month after Mejia Murillo's murder, Mejia Murillo's mother and brother abandoned their house at the direction of Los Vatos Locos members who implied that they would kill them if they did not leave the house within 72 hours of their order to vacate. The IJ discounted this incident, stating, "While the timing of this incident within a few weeks of [Mejia Murillo's] death could indicate that the Vatos Locos targeted [Mejia Murillo's mother and brother] because of their family ties to [Mejia Murillo], the gang may have forced [Mejia Murillo's] family members out of their home for other reasons." The IJ speculated that "the gang may have been asserting their authority, not targeting the family members of [Mejia Murillo]." Relying on Ungar's testimony, the IJ stated that gang-controlled neighborhoods like the one Mejia Murillo's mother and brother were living in are "very restricted" and that "gangs' violence against residents in their areas of control can seem gratuitous and unpredictable." For this reason, the IJ concluded: "[T]he fact that the Vatos Locos told [Mejia Murillo's mother and brother] to leave their home without additional information does not establish a connection to [Mejia Murillo's] death." The BIA summarized the IJ's analysis and then added: "We note that there is no indication from the record that [Mejia Murillo's] mother and brother have been harmed."

No. 18-60251

Third, a week or two after Mejia Murillo's death, Los Vatos Locos members confronted Morales Lopez's son at his school, asking him where Morales Lopez was and forbidding him to return to school. None of Morales Lopez's children returned to school that year. The IJ discounted this incident, stating, "[g]iven the extensive control the Vatos Locos seemed to have over the neighborhood, it is not clear that [Morales Lopez's son's] encounter with the Vatos Locos was connected to [Mejia Murillo]." The IJ speculated that "the encounter could have been an instance of forced recruitment."

Fourth, the IJ analyzed the incident in which (1) Morales Lopez saw a Los Vatos Locos member in her cousin's neighborhood and (2) Morales Lopez's cousin was brutally attacked. Because we previously discussed the IJ's analysis, we do not repeat it here.

The IJ stated, "While the Court appreciates the past trauma [Morales Lopez] suffered and the difficulty of returning to a country where she was raped and where her husband was murdered, the Court cannot conclude that [Morales Lopez's] fear of future persecution . . . is well-founded."

1.

Morales Lopez first argues that the IJ erred in applying a preponderance-of-the-evidence standard instead of a reasonable-possibility standard. Relatedly, Morales Lopez argues that the IJ failed to evaluate Morales Lopez's fear of future persecution using the four-part test set forth in *In re Mogharrabi*. We cannot reach these arguments, however, because Morales Lopez failed to raise them before the BIA. In other words, we lack jurisdiction to consider the arguments. *See Wang*, 260 F.3d at 452.

No. 18-60251

2.

Second, Morales Lopez argues that the IJ erred by conflating the past-persecution and well-founded-fear-of-persecution analyses. We agree.

The IJ stated in support of his finding that Morales Lopez's fear was not objectively reasonable: "As previously explained, the threats [Morales Lopez] personally received were too vague to qualify as past persecution." The BIA mirrored the IJ, stating: "As discussed above, the respondent's past experiences with the Vatos Locos gang does [sic] not amount to persecution." Accordingly, the IJ (and the BIA) did not discuss the threats against Morales Lopez in his well-founded-fear-of-persecution analysis.

"[D]espite finding adversely on claims of past persecution, the IJ must determine whether the petitioner demonstrated a well-founded fear of future persecution if asserted." *Cabrera v. Sessions*, 890 F.3d 153, 159 (5th Cir. 2018). The IJ echoed this logic earlier in his decision when he analyzed Morales Lopez's past-persecution claim: "[Morales Lopez] has not established that she suffered past persecution[.] However, the threats she received following the death of her husband may establish a well-founded fear of persecution[.]" But, then, he did not analyze the threats against Morales Lopez through the lens of her well-founded-fear-of-persecution claim. *Cf. Orellana-Monson*, 685 F.3d at 518 (concluding that a successful well-founded-fear-of-persecution claim requires the applicant to "show that a reasonable person in the same circumstances would fear persecution if deported") (internal quotation marks and citation omitted). Accordingly, the IJ erred.

3.

Third, Morales Lopez argues that the IJ erred by requiring direct proof of her persecutors' motives. In other words, Morales Lopez argues that the IJ required direct proof that, as the IJ put it, the "encounter[s] with the Vatos Locos [were] connected to [Mejia Murillo]." *Cf. Sharma v. Holder*, 729 F.3d

No. 18-60251

407, 412 (5th Cir. 2013) ("The alien carries the burden to establish a nexus between the persecution and one of the five statutory grounds for asylum.") (internal quotation marks and citation omitted). We agree.

A petitioner is not required to provide direct proof of a persecutor's motives, but the petitioner "must provide *some* evidence of it, direct or circumstantial." *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483 (1992) (emphasis in original). Further, fear of future persecution cannot be "negated simply because of general violence and civil disorder." *Eduard*, 379 F.3d at 190 (emphasis omitted). "Congress no doubt anticipated that citizens of countries rife with general violence and civil disorder would seek asylum in the United States. If it had intended to deny refugee status to applicants from such countries, . . . it would have presumably stated so." *Id.*

While "an applicant's fear of persecution cannot be *based solely* on general violence and civil disorder," *id.* (emphasis in original), Morales Lopez's fear is not so based. Nonetheless, the IJ speculated that Los Vatos Locos' motives behind their encounters with Morales Lopez's family members were based on the general state of violence and civil disorder in Honduras. The IJ improperly negated each encounter for this reason. *Cf. id.* As a result, it is unclear how Morales Lopez could have proved her claim without direct proof of Los Vatos Locos' motives. Accordingly, the IJ erred.

4.

Fourth, Morales Lopez argues that the IJ erred because he mischaracterized and did not meaningfully consider Ungar's testimony.[18] We agree.

---

[18] Morales Lopez generally argued that the "IJ ignored expert evidence that directly supported [Morales Lopez's] claim to have suffered past persecution *and* to have a well-founded fear of persecution." However, Morales Lopez tied her argument to an

No. 18-60251

As stated earlier, the IJ is not required to "address evidentiary minutiae or write any lengthy exegesis, [but] its decision must reflect meaningful consideration of the relevant substantial evidence supporting the alien's claims." *Abdel-Masieh*, 73 F.3d at 585 (citation omitted); *see also Cole v. Holder*, 659 F.3d 762, 771–72 (9th Cir. 2011) ("[W]here there is any indication that the BIA did not consider all of the evidence before it, a catchall phrase does not suffice, and the decision cannot stand.  Such indications include misstating the record and failing to mention highly probative or potentially dispositive evidence."); *Zhao*, 404 F.3d at 310 ("The IJ credited all of Zhao's testimony but interpreted it in such a way that allowed her to rule against him on grounds of legal sufficiency.  The IJ's summary of Zhao's testimony consists entirely of conclusory remarks, mischaracterizations of various events, and non-sequit[u]rs.").

Here, no evidence in the record contradicts Ungar's testimony, and the IJ found Ungar's testimony credible without qualification.  Nonetheless, the IJ stated that "gangs' violence against residents in their areas of control 'can seem gratuitous and unpredictable,'" focusing on only a partial statement from Ungar's testimony.  Using Ungar's statement, the IJ negated Morales Lopez's testimony "simply because of general violence and civil disorder." *Eduard*, 379 F.3d at 190.  However, the full sentence from Ungar's testimony is, "So in one sense, there's a structure of these gangs, on the other hand sometimes their violence can seem gratuitous and

---

example from only the IJ's well-founded-fear-of-persecution analysis.  Thus, we consider Morales Lopez's argument only as it pertains to the IJ's well-founded-fear-of-persecution analysis. *See In re HECI Expl. Co., Inc.*, 862 F.2d at 525.

unpredictable."[19]  As Ungar stated in the same sentence, "there's a structure of these gangs," which the IJ apparently ignored.

Speaking to the "structure" of gangs such as Los Vatos Locos elsewhere in his testimony, Ungar stated: "[O]ne of the modus operandi of gangs is a very consistently long focus on targeting those that they have already attacked, family members, children of victims, cousins, you know, anyone related to a person, over a period of many years continues to be intimidated and threatened by them."  Ungar effectively stated that Morales Lopez has a target on her back, concluding that there is "a very [sic] likelihood of homicide if she were returned.  Because of what is—the pattern that they've already established against her and her family.  The next step would be, and it has been for other families, murder, attacks on their lives."

Accordingly, the IJ erred by mischaracterizing and failing to meaningfully consider Ungar's testimony.

5.

Finally, Morales Lopez argues that the relevant substantial evidence compels a well-founded-fear-of-future-persecution finding.  We agree.  Because Morales Lopez has shown past persecution, she is entitled to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1).  But even if that presumption were not to apply, Morales Lopez has demonstrated, by a preponderance of the evidence, that there is a

---

[19] Morales Lopez emphasizes that Ungar stated that gangs' violence can "seem" gratuitous or unpredictable (presumably, as opposed to "is" gratuitous or unpredictable). But this places too much weight on the word "seem."  In his preceding sentence, Ungar stated that sometimes gangs "want to attack somebody" but also sometimes "they're high on drugs and they carry out an act of violence."  .

No. 18-60251

"reasonable possibility" that she would be persecuted if deported.[20] *See Cardoza-Fonseca*, 480 U.S. at 440 (concluding that a "reasonable possibility" can mean a ten percent chance).

In the first instance, it is undisputed that Morales Lopez established subjective fear of future persecution. Next, we determine whether the relevant substantial evidence would compel a reasonable adjudicator to find that Morales Lopez established objective fear. We apply the four steps articulated in *In re Mogharrabi*. *See Eduard*, 379 F.3d at 191.

First, Morales Lopez possesses a "characteristic" that Los Vatos Locos "seeks to overcome by means of punishment of some sort." *See id.* Specifically, Los Vatos Locos seeks to overcome Morales Lopez's membership in the particular social group of "immediate family members of Jose Carlos Mejia Murillo" by means of torture or death. Los Vatos Locos tortured and murdered her husband after the gang threatened and harassed him over the span of two years. Following his murder, Los Vatos Locos leveled multiple and varied menacing threats of harm against Morales Lopez, including an explicit death threat. Several of these threats referred to Mejia Murillo specifically and made clear that Morales Lopez was a target because of her relationship to Mejia Murillo.

Second, Los Vatos Locos is already aware that Morales Lopez is an immediate family member of Mejia Murillo. *See id.* As stated above, several of Los Vatos Locos' threats of harm against Morales Lopez referred to Mejia Murillo specifically and Morales Lopez's relationship to him.

Third, Los Vatos Locos has "the capability of punishing" Morales Lopez. *See id.* Mejia Murillo's death at the hands of Los Vatos Locos shows

---

[20] In other words, Morales Lopez has shown that it is more likely than not that she would face a ten percent chance or more of persecution if deported.

this. So, too, does the brutal attack on Morales Lopez's cousin and Los Vatos Locos' ordering Mejia Murillo's family members to vacate their house. As Morales Lopez recounted, a few months before her husband's murder, Los Vatos Locos had killed her neighbor and, several months later, killed his wife. And Ungar's testimony supports the fact that Los Vatos Locos is capable of punishing Morales Lopez. Again, he stated that there is "a very [sic] likelihood of homicide if [Morales Lopez] were returned. Because of what is—the pattern that they've already established against her and her family. The next step would be, and it has been for other families, murder, attacks on their lives."

Fourth, Los Vatos Locos "has the inclination to punish" Morales Lopez. *See id.* Ungar's testimony establishes this. As stated previously, Ungar testified: "[O]ne of the modus operandi of gangs is a very consistently long focus on targeting those that they have already attacked, family members, children of victims, cousins, you know, anyone related to a person, over a period of many years continues to be intimidated and threatened by them."[21] Ungar stated that Morales Lopez faces a 75 to 80 percent chance of being put in "serious danger for her life" by Los Vatos Locos if she is deported.

---

[21] Ungar additionally stated:

> The threats made against [Morales Lopez] are consistent with one of the most well-known practices of these criminal groups: the persistent targeting of specific individuals, couples, or families. In many areas, for example, gangs will attack every member of the family of a business owner who does not pay the war taxes. Families of ex-girlfriends, wayward members, or anyone seen as cooperating with the police are all in the crossfire, and with a relentlessness that survives time. . . . Anyone suspected of being affiliated with rival groups . . . makes them particularly vulnerable to attack. [Morales Lopez's] long connection with the drug gangs, derivative of her marriage to her now deceased husband, clearly creates such vulnerability for her.

No. 18-60251

Overall, Morales Lopez presented "specific, detailed facts showing a good reason to fear that . . . she will be singled out for persecution." *Orellana-Monson*, 685 F.3d at 518 (emphasis omitted).

Accordingly, the relevant substantial evidence—when considered as a whole—compels a well-founded-fear-of-future-persecution finding.

## IV.

For the reasons above, we GRANT, in part, and DENY, in part, the petition; REVERSE the IJ's order of removal; and REMAND for any further necessary proceedings in accordance with this opinion.