**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 2, 2009

Charles R. Fulbruge III
Clerk

No. 07-61008

YANFEN WANG

Petitioner

v.

ERIC HOLDER, JR., U S ATTORNEY GENERAL

Respondent

Petition for Review of an Order of the
Board of Immigration Appeals

Before JONES, Chief Judge, and HIGGINBOTHAM and HAYNES, Circuit
Judges.

HAYNES, Circuit Judge:

Yanfen Wang[1] appeals the decision of the Board of Immigration Appeals
(BIA) affirming the decision of an Immigration Judge (IJ) to deny Wang's
request for asylum, withholding of removal and relief under the Convention
Against Torture (CAT). For the reasons set forth below, we DENY the petition
for review.

---

[1] Identity is a disputed fact in this case. In other words, the government does not
concede that the person calling herself "Yanfen Wang," is, indeed, Yanfen Wang. Because that
is the name she used before the Immigration Judge in the proceedings below, we refer to her
that way in this opinion.

## I. Factual Background

Wang is a native and citizen of the People's Republic of China. She was admitted to the United States in September 2004 as a non-immigrant, under a false identity, with authorization to remain in the United States for a temporary period not to exceed December 13, 2004. Wang stayed beyond the date authorized, and on August 22, 2005, the Department of Homeland Security served her with a Notice to Appear alleging removability under INA § 237(a)(1)(B), because, after her admission as a non-immigrant, she remained in the United States for a time longer than permitted.

Wang filed an application for asylum, withholding of removal, and CAT relief. She attached a declaration to the application claiming that she was persecuted in China for joining a secret family church of the Christian faith. On or about February 10, 2006, Wang updated her previously written statement with an amended statement and a declaration.

At her hearing, Wang admitted to the allegations contained in the Notice to Appear and conceded the charge of removability. Wang requested a Mandarin interpreter, and one was provided. The hearing proceeded with Wang as the only witness. She expressed no difficulty understanding the interpreter during her direct testimony when questioned by her own attorney.

Wang testified that her birth name was Yanfen Wang, and she was married to Tao Ming. They had one 20-year-old child who still resided in China with Ming. Wang became a Christian in May 2001, but her husband and daughter remained Buddhists. Wang testified that she was persecuted in China because of her Christian faith.

Wang came to the United States on September 14, 2004. Wang entered the United States under the identity of "Zhijun Duan," a name she had used since June 30, 2004, according to a Chinese passport bearing that name. Wang possessed two other documents bearing the name "Zhijun Duan," a visa issued

by the U.S. State Department, and a Chinese Resident Identification Card. These documents were found to be genuine after a DHS forensics examination. As proof of her true identity, Wang submitted a notarized birth certificate, another Chinese Resident Identification Card bearing the name of "Yan Fen Wang," and a copy of a household registry from China. The identification card bearing the name of "Yan Fen Wang" was also deemed to be genuine by a forensics examiner at the DHS. It did not contain a picture.

The IJ noticed that the household registry stated that she had a "second son" and that the "housemaster" was "Wang Yanfen." Wang explained that the second son was actually her husband and that the household registration contained a mistake.[2]

In May 2001, after she became a Christian, Wang began attending church meetings every week. She would usually attend meetings with approximately twelve other people. Her testimony was confusing about who these twelve people were and whether they were the same twelve people or varied; she claimed not to know the names of the others attending the meetings. She stated that she knew them only as "Christian brothers and sisters."

Wang hosted group meetings at her home, and she estimated that she did so between five and ten times. During cross-examination, government counsel pointed out that Wang's most recent written statement mentioned only two meetings, in October 2002 and June 13, 2004. The IJ stated that Wang's written statement and her testimony were inconsistent. Wang explained that she did not write down the dates of all the meetings but wrote those two times as examples. She explained that she remembered those two meetings "more

---

[2] It would be a biological impossibility for Wang to be the mother of the "second son" listed on the registry, who was identified as Ming Tao, as he was born before her. Of course, that does not answer the question of whether the person identified as Wang in the hearing was the same person listed in the registry. Wang submitted a copy of a marriage certificate, dated December 31, 1982, between Yanfen Wang and Ming Tao.

3

dearly" because October 2002 was the first meeting at her house and the 2004 meeting was when she was arrested.

Wang testified that on June 13, 2004, she was holding a Bible study meeting at her home when she and five or six fellow Christians were arrested by the police. Wang testified that she was incarcerated from June 13 to 25, during which time she was interrogated and beaten daily. The police slapped her, pulled her hair, used knives to cut her arm, kicked her, and tied her wrists with wire. Wang testified that she eventually confessed to organizing illegal meetings, passing out illegal propaganda, and disturbing the peace because they kept hitting her and she could not take it anymore.

During cross-examination, government counsel observed that Wang had testified that her wrists had been bound, but her declaration stated that her thumbs had been bound. Wang stated that she meant to testify that her thumbs, not her wrists, had been bound. The interpreter explained that Wang did not use the word wrist or thumb and that the interpreter may have used the word wrist based on hand motions by Wang.

Wang testified that she was released from custody so she could obtain medical treatment, but she was required to report back to the police every two weeks. Wang provided two pages of brief medical records to document her medical treatment, one showing a date of June 25, 2004, the other undated.[3] She testified that she was unable to return to work because of her physical injuries, and she was eventually fired from her job because of her prior activities with her church. Wang provided a notice, dated June 20, 2004, terminating her position due to her engagement in an "evil religion organization" in violation of the law.

---

[3] The two pages of medical records are short and sketchy. They state that Wang was "Beaten by others" and recommend treatment with "honghua oil for external use," as well as other items listed as "illegible" by the translator.

Wang testified that she first began using the name "Zhijun Duan" in June 2004 after she was released from prison, so she could escape from China. She explained that her pastor, Jun Chen, managed to obtain a genuine Chinese Resident Identification Card for her and a passport bearing the name "Zhijun Duan." Wang later used the passport to get a visa to the United States.

On August 22, 2004, Wang went to Singapore using the Duan passport seeking asylum, but once there, she learned that she could not get asylum in Singapore. However, she was not deported from Singapore. Wang's reasons for returning to China were the subject of inconsistent testimony. She said that she returned so that she could report to the police as required by her conditions of release. She also said it was so she could join a group that was coming to the U.S. When the IJ challenged her on the inconsistency, Wang explained that she did not hear the IJ's question clearly. She then repeated her original answer that her pastor told her to hurry back to China because she had to report to the police. The IJ continued to question her, her counsel objected once to the allegedly confusing nature of the questioning, and the IJ played back the tape of her testimony. Wang then agreed that her pastor did tell her about the group when she spoke to him on the phone while in Singapore.

Wang's counsel asked Wang more questions about when she was in custody. He asked her to show him how the wire was used on her hands, and she put her hands together with her thumbs sticking out. He asked her where the police put the wire, and she said around "the thumbs." Wang testified that they never put wires around her wrists. Her counsel asked if she had mentioned the word wrists earlier in her testimony, and she denied mentioning wrists, but she also said, "It was mentioned but I misunderstood, I heard it wrong." Wang's counsel twice requested a new trial, claiming that the interpreter was not competently interpreting the questions and testimony. The IJ overruled the

motions and asked Wang whether she was having any particular problems with the interpreter. Wang indicated that she was not.[4]

Wang knew one person in the Houston area, Shusen Sun, who had met her in China in 2001 through the Hexi Family Church in Tianjin, China. Wang submitted his affidavit, but he did not testify live "because he was working."

## II. The IJ and BIA Decisions

The IJ found Wang removable as charged and denied her applications for asylum, withholding and protection under the CAT. The IJ found that Wang's testimony was not plausible, believable or consistent enough to warrant a positive credibility finding. The IJ characterized Wang's testimony as vague, hesitant and evasive. The IJ stated that Wang did not handle confrontation by the Government on cross-examination in a reasonable manner. The IJ found that there were contradictions and discrepancies in her testimony, some minor, some significant. She also found Wang's testimony about her incarceration and beatings incredible due to Wang's lack of emotion that seemed to the IJ more consistent with one who has rehearsed a story, rather than one who lived the events.

As an example, the IJ found that the circumstances surrounding Wang's return to China from Singapore were material, but that she did not provide a reasonable explanation for the contradiction in her testimony, and the explanation given was not plausible and not supported by the entirety of her testimony. The IJ found inconsistencies surrounding Wang's testimony concerning her return to China from Singapore in August 2004. Wang originally testified that she returned to China in order to report to the police, as she had been ordered to do after her alleged arrest and detention in June 2004. She then changed her testimony, claiming that her pastor had encouraged her to return

---

[4] Wang's brief suggests that the IJ also speaks Mandarin Chinese, but this fact does not appear in the administrative record.

so she could join a tour group to the United States. She then testified that she did not learn about the tour group until after her return to China. The IJ found that Wang "failed to provide [a] reasonable and plausible explanation for the contradiction."

The IJ found, "[m]ost importantly," that Wang had not established her personal identity, a critical factor under § 1158(b)(1)(B)(i). The IJ observed that Wang's passport, which she used to enter and exit China, and to obtain a visa from the United States embassy, as well as her personal identity card, were all issued under the name of "Zhijun Duan" and were found to be legitimate or otherwise genuine. The IJ noted that Wang claimed that her real name was Yanfen Wang, and that she had submitted several documents to prove her real identity, including a Chinese identification card, a household registration, a marriage certificate, and a birth certificate. Due to mistakes in these documents and their lack of credibility, the IJ found that her personal identity was not established because she had failed to convince the court that she was in fact Yanfen Wang. The IJ discounted the evidence from Shusen Sun, who attested in an affidavit that he knew Wang as a member of the family church in China, because she did not call him to testify in person because he was working.

The IJ stated that whenever Wang was confronted with an inconsistency or contradiction, she blamed it on a misunderstanding of the interpreter. The IJ observed that Wang "did not seem to have any problem with the interpreter while she was providing direct testimony." The IJ noted that Wang repeatedly confirmed that she had no problem understanding the interpreter. The IJ stated that her testimony was vague and unspecific and conclusional as to certain important events if her life, in particular, her pattern of traveling outside of China and returning.

The IJ noted that there was no evidence of any pro or anti-government official or entity in China having any interest in "this respondent" and that she

had no difficulty living in China, or otherwise traveling freely in and out of China under her passport in the name of Zhijun Duan. Accordingly, the IJ found that she failed to demonstrate that she had a well-founded fear of persecution or would likely be tortured if returned to China.

Wang appealed the decision of the IJ to the BIA. Wang argued that the IJ should have continued the hearing when it became apparent that there was a problem in the oral translation. She also argued that the IJ's credibility determination was not supported by the evidence and should be reversed because the evidence compelled a different conclusion. The BIA adopted and affirmed the decision of the IJ, stating: "Given the Immigration Judge's observation of the respondent's demeanor and the respondent's inconsistent and implausible testimony at the hearing regarding her identity and the secret 'family church' she belonged to in China, we do not find the Immigration Judge's adverse credibility finding to be clearly erroneous." Wang filed a timely petition for review.

### III. Standard of Review

A. Background

When considering a petition for review, this court has the authority to review only the BIA's decision, not the IJ's decision, unless the IJ's decision has some impact on the BIA's decision. *Mikhael v. INS*, 115 F.3d 299, 302 (5th Cir. 1997). However, this court may review the IJ's findings and conclusions if the BIA adopts them. *Efe v. Ashcroft*, 293 F.3d 899, 903 (5th Cir. 2002). The BIA adopted and affirmed the IJ's decision based upon the reasons set forth therein, giving this court authority to review the IJ's decision.

On a petition for review of a BIA decision, this court reviews factual findings for substantial evidence. *Chun v. INS*, 40 F.3d 76, 78 (5th Cir. 1994). Under substantial evidence review, this court may not reverse the BIA's factual findings unless the evidence compels it. 8 U.S.C. § 1252; *INS v. Elias-Zacarias*,

502 U.S. 478, 483-84 (1992). The alien must show that the evidence was so compelling that no reasonable factfinder could conclude against it. *Id*.

For many years we have stated that it is the factfinder's duty to make determinations based on the credibility of the witnesses, and this court cannot substitute its judgment for that of the BIA or IJ with respect to factual findings based on credibility determinations. *Chun*, 40 F.3d at 78. However, historically we have required that an adverse credibility determination still "must be supported by specific and cogent reasons derived from the record." *Zhang v. Gonzales*, 432 F.3d 339, 344 (5th Cir. 2005). We have previously stated that credibility determinations that are unsupported by the record and are based on pure speculation or conjecture will not be upheld, but if the IJ's credibility determinations are supported by the record, they will be affirmed. *Mwembie v. Gonzales*, 443 F.3d 405, 410 (5th Cir. 2006).

B. Reviewing Credibility Determinations under the REAL ID Act

Effective May 11, 2005, Congress passed the REAL ID Act, which amended the standards for assessing credibility. *See* REAL ID Act §§ 101(a)(3), (c), (h)(2), Pub. L. 109-13, 119 Stat. 302. Because Wang filed her application in June of 2005, after the effective date of the Act, the new standards for evaluating witness credibility apply. We have not previously addressed in a published opinion how to apply those standards and whether this court's review of an IJ's assessment of credibility under those standards should be different as a result.

Under the Act, an applicant's testimony, alone, may be sufficient to sustain the burden of proving eligibility for asylum, "but only if the applicant satisfies the trier of fact that [his] testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii). In making its credibility determination, the trier of fact may consider:

the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

§ 1158(b)(1)(B)(iii). Under this new provision, our sister circuit has held that the IJ may base an adverse credibility determination on inconsistencies without regard to whether they go to the "heart" of the applicant's claim. *Lin v. Mukasey*, 521 F.3d 22, 26-28 (1st Cir. 2008); *but see Ndrecaj v. Mukasey*, 522 F.3d 667, 674-75 (6th Cir. 2008) (citing to the new provision but continuing to rely on a "heart of the claim" analysis; application appears to have been filed before the date of the Act).

The new Act does not expressly address appellate review of an IJ's adverse credibility determination. Nonetheless, Congress's express rejection of the prior "heart of the applicant's claim" standard demonstrates an intent to provide more discretion to the IJ in determining credibility of witnesses, including the petitioner herself.

We have long employed a highly deferential review to assessments of credibility by factfinders. *See, e.g., United States v. Ford*, 558 F.3d 371, 376 (5th Cir. 2009) (addressing jury findings and concluding that "this Court is bound to accept a jury's credibility determinations unless the challenged testimony 'is so unbelievable on its face that it defies physical laws.'") (internal citations omitted). This deferential standard has been applied to credibility determinations by an IJ even before the new Act took effect: "Under the

substantial evidence standard applicable to review of denials of asylum, we must defer to the BIA's factual findings unless the evidence is so compelling that no reasonable fact finder could fail to find otherwise." *Mikhael*, 115 F.3d at 304. The question then becomes what the standard of review is under the REAL ID Act.

Although we have not previously addressed this issue under the new Act, the Second Circuit has done so on multiple occasions. The Second Circuit concluded that, under the Act, "an IJ may rely on *any* inconsistency or omission in making an adverse credibility determination as long as the 'totality of the circumstances' establishes that an asylum applicant is not credible . . . . We defer therefore to an IJ's credibility determination unless, from the totality of the circumstances, it is plain that no reasonable fact-finder could make such an adverse credibility ruling." *Lin v. Mukasey*, 534 F.3d 162, 167 (2d Cir. 2008); *see also Zhao v. Mukasey,* 553 F.3d 436, 444 (6th Cir. 2009) (quoting new provision and continuing to apply its prior standard of review: "[T]he BIA's determination should be upheld unless evidence not only supports a contrary conclusion, but indeed *compels* it.") (internal citations and quotation marks omitted); *Husyev v. Mukasey,* 528 F.3d 1172, 1182 (9th Cir. 2008) (continuing to apply previous standard to cases under the new Act: "we must uphold the IJ's decision unless the evidence compels a reasonable factfinder to reach a contrary result."); *Mitondo v. Mukasey*, 523 F.3d 784, 787-88 (7th Cir. 2008) (indicating that new Act's credibility section was enacted because Congress was "[d]issatisfied with judicial reluctance to accept immigration judges' credibility decisions" and noting that "the statute requires courts to use in immigration proceedings the same deferential approach traditionally applied to credibility findings in labor cases and other administrative controversies."); *Ismaiel v. Mukasey,* 516 F.3d 1198, 1205 n.5 (10th Cir. 2008) (observing that the Real ID Act "has supplemented § 1252(b)(4)(B) by limiting circuit-court review of credibility findings" but finding

that section inapplicable to this case because the application was filed before the effective date of the Act); *Li v. Holder*, No. 08-2032, 2009 U.S. App. LEXIS 7617, at *3-*4 (4th Cir. 2009) (unpublished)[5] ("This court accords broad, though not unlimited, deference to credibility findings supported by substantial evidence."); *cf. Kueviakoe v. United States Attorney General*, No. 08-11359, 2009 U.S. App. LEXIS 10060, at *10 (11th Cir. 2009) (reversing adverse credibility determination based upon inconsistencies "because they were not inconsistencies at all; that is no reasonable fact-finder could conclude on this record that they were inconsistencies.").

Considering our prior standard in light of the amendments effectuated by the new Act, we conclude that the Second Circuit's formulation of the standard is the correct one, and we adopt it here.

## IV. Credibility

We turn now to the adverse credibility determination in this case. In addition to the deference we must give the IJ's findings pursuant to statute, we note that the asylum application presents a particularly difficult area for demeanor evaluations and appellate review of same. As the Seventh Circuit observed:

> Asylum cases pose thorny challenges in evaluating testimony. Applicants regularly tell horrific stories that, if true, show past persecution and a risk of worse to come. But these stories rarely are susceptible to documentary proof, . . . .
>
> Most claims of persecution can be neither confirmed nor refuted by documentary evidence . . . . Yet many aliens, who want to remain in the United States for economic or social reasons unrelated to persecution, try to deceive immigration officials . . . . How is an

---

[5] While unpublished opinions are not binding precedent, they may be persuasive on the legal issues, and are cited in the interest of maintaining consistency across the spectrum of federal law. This particular citation is offered as an insight into the Fourth Circuit's current thinking on this subject.

immigration judge to sift honest, persecuted aliens from those who are feigning?

So what gives the liar away? . . . In a nutshell: details matter, and the story's periphery may expose a liar.

*Mitondo*, 523 F.3d at 788-89.

Examining the facts here presented, much depends upon demeanor and inferences to be drawn therefrom. On the face of it, Wang presents a compelling story – arrest, harassment and beatings due to her Christian faith. If believed, her story would seem to support granting of asylum. Yet nothing in this record *compels* belief in her story. The medical records are sketchy and unhelpful. The identity evidence is confusing and suspect. The witness who knew her in China and who might corroborate her testimony was not called, despite his apparent availability. *See* 8 U.S.C. § 1252(b)(4)(D) (regarding findings about corroboration).

As far as Wang's testimony itself, we recognize the fact that speaking through an interpreter can be difficult and result in problems. The IJ – whom Wang claims actually speaks Mandarin Chinese – specifically found that Wang only had difficulties with the interpreter when it came to questions from the government and the IJ, not her own attorney. The possibility exists that Wang genuinely had a problem with the interpreter. The possibility also exists, however, that Wang feigned a problem to avoid probing questions about inconsistencies in a false story. Given that the entire proceeding was tape recorded, we see nothing to indicate that Wang could not have offered evidence of an improper translation in a motion for reconsideration based upon that tape if the translation was faulty.[6] Thus, in choosing between the two possibilities –

---

[6] We also, therefore, reject Wang's claim that the alleged inadequacies of the interpreter violated her due process rights. *See Teng v. Mukasey*, 516 F.3d 12, 18 (1st Cir. 2008) ("Here, Teng does not point to *any* specific parts of this testimony that were

13

truthful difficulties and feigned difficulties – we have no basis to set aside the IJ's conclusions.

The same is true of the general believability of her story. The IJ has extensive experience with witnesses who assert persecution, and her evaluation of whether or not Wang was credible cannot be disturbed simply because Wang believes the IJ was unfriendly or even hostile. An appellate court is not in a position to judge Wang's demeanor, and the IJ was not required to accept Wang's testimony as true in the face of inconsistencies and verbal and nonverbal cues of deception. Nothing in her story compels a conclusion in her favor or supports a conclusion by this court – one far removed from the hearing room – that no reasonable factfinder could disbelieve Wang.

Finally, on the question of identity, some evidence supports Wang, but it does not compel a conclusion in her favor. On the one hand, the simple use of a false identity to leave the country, by itself, does not support denying asylum relief. *See Kaur v. Ashcroft*, 379 F.3d 876, 889 (9th Cir. 2004) ("That Kaur used a false passport to leave India, where she testified she was being harassed and sought after by government officials, is entirely consistent with her claim."). On the other hand, once she departed from China, she should have been honest with United States immigration officials, confessing her true name, if, indeed, "Wang" is her true name. The IJ identified various contradictions and questions about her documentation. While we might have viewed the evidence differently, we cannot say that no reasonable factfinder could come to the same conclusion as the IJ.

---

mistranslated, claiming only generally that the translation services were inadequate. This is hardly enough."). While here there was some argument that the translator may have confused "wrist" and "thumb," Wang's attacks on the translator's proficiency are unsupported by any credible evidence.

We conclude that the IJ's adverse credibility finding is supported by substantial evidence as judged under the standards of the new Act. We thus deny petitioner's requested relief that was predicated on the grounds of the IJ's alleged improper determination of demeanor and identity.

## V. IJ's Alleged Bias

The final ground for relief urged by Wang is couched as a denial of due process based upon the alleged bias of the IJ. It is questionable whether this ground was properly raised before the BIA. Assuming without deciding that the question is properly before us, we overrule this ground as well.

Wang contends that the IJ was biased against her and impermissibly injected herself in the proceedings turning into a "prosecutor" rather than a neutral arbiter. We agree with Wang that a due process violation can be premised upon the absence of a neutral arbiter. We disagree that she has shown such a situation here.

Wang relies upon the Supreme Court's decision in *Liteky v. United States*, 510 U.S. 540 (1994), a criminal case. In that case, the Court made clear that a finding of bias supporting recusal based upon conduct by the judge in a hearing or trial is very rare: "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion . . . . [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the . . . proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555. The Court explained further: "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* Of importance to the Court was the source and degree of such hostility: "[Remarks may support a bias motion] if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high

degree of favoritism or antagonism as to make fair judgment impossible." The Court made quite clear the displays of temper will not suffice: "*Not* establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display." *Id.* at 555-56.

Judged against *Liteky*'s measuring stick, the IJ's conduct falls far short of the type of conduct necessary to sustain a bias motion. The record reveals a judge who was trying to get to the bottom of Wang's story. While the IJ may have interrupted more frequently than Wang liked, she did not prevent Wang from presenting her evidence. Wang is critical of the IJ's questioning, but she fails to point to any specific area that was improper and cited only one instance of her attorney objecting to the questioning. *Compare Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) (reversing IJ adverse decision because IJ prevented the applicant from presenting his evidence), with *Shoaira v. Ashcroft*, 377 F.3d 837, 843 (8th Cir. 2004) ("it is telling that the petitioners point to no evidence that the IJ's conduct discouraged or prohibited them from providing.") *and Almaghzar v. Gonzales*, 457 F.3d 915, 922 (9th Cir. 2006) ("Although the IJ showed impatience at times, Almaghzar had ample opportunity to present his case, and the record as a whole does not suggest that the IJ did not conduct the hearing with an open mind."). It is commonplace in bench trials for judges to ask questions, and we will not transmute such a commonplace occurrence into a due process violation without considerably more than Wang has demonstrated here. *See, e.g., Vargas-Hernandez v. Gonzales*, 497 F.3d 919, 927 (9th Cir. 2007) ("This is not a case where the IJ prevented a full examination of the applicant, . . . stood in moral judgment of the alien, . . . or pressured a pro se alien to drop a claim for relief that he was entitled to pursue, . . . .") At best for Wang, she has suggested that the IJ was impatient. She has not shown any hostility due to extrajudicial

sources or such a degree of hostility that fair judgment was impossible. We conclude that Wang has not established a due process violation.

## VI. Conclusion

For the reasons set forth above, we DENY Wang's petition for review.