# United States Court of Appeals
# for the Fifth Circuit

————————————

No. 22-60310
Summary Calendar

————————————

United States Court of Appeals
Fifth Circuit

**FILED**
April 13, 2023

Lyle W. Cayce
Clerk

Imanzi Jean Paul Kamanzi,

*Petitioner*,

*versus*

Merrick Garland, *U.S. Attorney General*,

*Respondent*.

————————————————————————

Petition for Review of an Order of the
Board of Immigration Appeals
Agency No. A200 162 598

————————————————————————

Before Higginbotham, Graves, and Ho, *Circuit Judges*.

Per Curiam:[*]

Imanzi Jean Paul Kamanzi, a native of Congo and a citizen of Rwanda, petitions for review of the decision of the Board of Immigration Appeals (BIA) dismissing his appeal and affirming the immigration judge's (IJ's) denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-60310

Kamanzi argues that the BIA erred in upholding the IJ's adverse credibility finding because it was not based on the "totality of the circumstances" and is not supported by the record. He further argues that the BIA erred in affirming the IJ's finding that he failed to submit reasonably available corroborating evidence. Finally, Kamanzi argues that the BIA erred in upholding the IJ's finding that he was not eligible for asylum relief because he had failed to prove that he was not a citizen of Congo.

This court reviews the BIA's decision and considers the IJ's decision only to the extent it influenced the BIA. *Orellana-Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012). The BIA's factual findings are reviewed for substantial evidence, and its legal conclusions are reviewed de novo. *Id.* The substantial evidence test "requires only that the BIA's decision be supported by record evidence and be substantially reasonable." *Omagah v. Ashcroft*, 288 F.3d 254, 258 (5th Cir. 2002). This court will not reverse the BIA's factual findings unless the evidence compels a contrary conclusion. *Orellana-Monson*, 685 F.3d at 518.

*Credibility Determination*

The IJ determined that Kamanzi was not a credible witness based on several findings, which Kamanzi challenges on appeal. "Credibility determinations are factual findings that are reviewed for substantial evidence." *Avelar-Oliva v. Barr*, 954 F.3d 757, 763 (5th Cir. 2020).

First, the IJ found that Kamanzi gave conflicting testimony about why he had not tried to contact his family. Because the IJ reasonably found that Kamanzi's testimony that he had not tried to contact his family in several years because he was scared was inconsistent with his later testimony that he had tried to search for his mother on the internet, we uphold the IJ's finding. *See Omagah*, 288 F.3d at 258.

The IJ also found that it was implausible that Kamanzi's mother would not have tried to contact him once she had safely relocated to the refugee camp in Uganda. Kamanzi contends that the IJ's finding is based solely on speculation and conjecture. *See Wang v. Holder*, 569 F.3d 531, 537 (5th Cir. 2009).

Kamanzi argues that there is no evidence in the record that his mother was safe in the refugee camp or that she had the capability to make international phone calls. This argument is belied by the record given Kamanzi's testimony that his mother spoke by phone to his father's best friend in Rwanda, told him that she was "doing okay" at the refugee camp, and gave him Kamanzi's cell phone number. As such, the IJ reasonably found that it was implausible that Kamanzi's mother would not have contacted him from the refugee camp. *See Omagah*, 288 F.3d at 258.

The IJ also found that it is implausible that Kamanzi did not bring the letter from Jean Bosco Niyonsaba, his father's best friend in Rwanda, to his interview with the asylum officer. Kamanzi relied heavily on the letter to support his claims of the Rwandan government's surveillance and persecution of its citizens. Given the importance of the letter, Kamanzi's explanation that he simply forgot to take it to his asylum interview, is implausible and the IJ was right to reject it. *See Morales v. Sessions*, 860 F.3d 812, 817 (5th Cir. 2017).

Kamanzi further argues that the IJ's finding that Niyonsaba's letter was unreliable is not supported by substantial evidence and is not a valid basis for finding that Kamanzi was not a credible witness. The IJ gave several reasons for finding that Niyonsaba's letter was "suspect." First, the IJ noted that the letter was written in English even though it "purported to be from a French speaker." Though Kamanzi points out that there is no direct evidence that Niyonsaba did not speak English and notes that English is one

of the four languages spoken in Rwanda, the specific evidence in the record does not compel the conclusion that Niyonsaba spoke English fluently enough to have written the letter, *see Orellana-Monson*, 685 F.3d at 518.

The IJ also noted that all of the information in the letter was discussed in a previous phone call between Kamanzi and Niyonsaba. As such, the IJ found that the letter served "no legitimate purpose other than to try to bolster [Kamanzi's] asylum claim." Kamanzi essentially concedes that the letter "added nothing new," but he argues that this alone does not make the letter suspect. The IJ did not rely on this fact alone and considered various other aspects of the letter in finding that the letter was suspect, including that it simply rehashed the phone conversation between Kamanzi and Niyonsaba. Kamanzi has not shown that the evidence compels the reversal of the IJ's finding. *See Orellana-Monson*, 685 F.3d at 518.

Kamanzi also challenges the IJ's finding that Niyonsaba's explanation that he had typed the letter on the computer rather than writing it because he feared that the government was monitoring him made no sense. While Kamanzi points to country conditions evidence showing that the Rwandan government monitors the private communications of its citizens, the IJ did not make a finding to the contrary. The IJ simply did not believe, based on Kamanzi's testimony, that Niyonsaba had drafted the letter on the computer out of fear of being monitored by the government. In any event, the IJ's findings considered in the aggregate, support the IJ's characterization of the letter as suspect. *See Orellana-Monson*, 685 F.3d at 518.

The IJ also found it suspicious that Niyonsaba sought to "cut communication" with Kamanzi immediately after writing the letter. The IJ explained that "[t]his is something that false asylum seekers frequently try to say" (i.e., that a person providing corroborating information related to their asylum claim is unavailable to testify). Kamanzi argues that it was improper

for the IJ to assume fraudulent intent on his part and question the authenticity of the letter, simply because other asylum seekers had "employed this tactic." But to the extent the IJ may have erred by relying on inferences drawn from other proceedings, the other evidence on which the IJ based the credibility finding supports the finding, rendering any error harmless. *See Singh v. Garland*, 20 F.4th 1049, 1053 (5th Cir. 2021).

Kamanzi next challenges the IJ's finding that there was "a tension" between his claim that the Tutsi-led government in Rwanda persecuted his family and the fact that his father was a supporter or member of the Tutsis. He argues that the IJ overlooked the basis for his asylum claim, which is that his family was persecuted by the government because Kamanzi's sister married a Hutu leader and rival of the Tutsi-led government.

Though Kamanzi testified that his father was allegedly arrested after he took Kamanzi's sister to Uganda for her safety, there is no evidence in the record as to who arrested his father or why he was arrested. As such, it was reasonable for the IJ to weigh Kamanzi's testimony that his father was a supporter of the Tutsi-led government more heavily than Kamanzi's speculation that his father was arrested by the government he supported. *See Omagah*, 288 F.3d at 258.

Kamanzi complains that because he was living in the United States, it was unreasonable for the IJ to discount his testimony regarding his family's persecution in Rwanda, which was relayed to him by his mother, as hearsay. Nonetheless, "it was within the purview of the IJ to make any credibility determinations and to accord the appropriate weight to be given to the evidence and testimony [Kamanzi] presented, including hearsay." *Ordonez-Mejia v. Sessions*, 732 F. App'x 356, 357 (5th Cir. 2018) (citing *Castillo-Lopez v. INS*, 437 F.2d 74, 75 (5th Cir. 1971)).

No. 22-60310

Finally, the IJ noted that the end of Kamanzi's college career in the United States "just happened to coincide with the reported arrest of [his] brother-in-law in Rwanda," which the IJ found, in itself, was "very suspicious." Kamanzi challenges the suggestion that he "cooked up" the theory supporting his asylum claim and points out that he did not fall out of status until 2012, which was after his brother-in-law was arrested and sentenced to prison.

Kamanzi testified that he decided to apply for asylum in January of 2012, but he did not actually file his application until September of 2012, which was just a few months after he withdrew from college in May of 2012. Given Kamanzi's other implausible testimony, it was not unreasonable for the IJ to question the timing of Kamanzi's asylum application in evaluating his credibility. *See Omagah*, 288 F.3d at 258.

*Corroborating Evidence*

Kamanzi argues that the BIA erred in upholding the IJ's determination that he had failed to submit sufficient corroborating evidence in support of his claims because the evidence identified by the IJ was not reasonably available to him. *See Avelar-Oliva v. Barr*, 954 F.3d 757, 764 (5th Cir. 2020).

Kamanzi's challenge to the BIA's finding focuses primarily on the fact that his sister's marriage certificate was not reasonably available to him because he had no specific need for it until 2012, and by that time, his sister had already left Rwanda for the camp in Uganda and his mother had fled Rwanda following the murder of Kamanzi's older brother. But the BIA accepted Kamanzi's explanation for why he could not obtain his sister's marriage certificate.

As to his failure to present any other corroborating evidence, Kamanzi argues that the IJ should have found that letters from his sister and mother

6

were not reasonably available to him because he had not had contact with them since 2012. This argument ignores the BIA's finding that Kamanzi presented "no corroborating evidence from the time before his family left the country and were in regular contact with him." The record therefore does not compel the reversal of the BIA's determination that Kamanzi failed to present sufficient evidence in support of his claims for immigration relief. *See Orellana-Monson*, 685 F.3d at 518.

*Evidence Regarding Citizenship*

Kamanzi contends that the BIA erred in refusing to take administrative notice of Congo's citizenship laws or, in the alternative, to remand his case to the IJ for consideration of his citizenship. *See Matter of B-R-*, 26 I. & N. Dec. 119, 121-22 (BIA 2013).

Kamanzi's brief before the BIA contains no request that the BIA take administrative notice of Congo's citizenship laws. Even if he made such a request, the BIA was not required to take administrative notice of the documents Kamanzi presented for the first time on appeal. *See* 8 C.F.R. § 1003.1(d)(3)(iv)(A).

The BIA likewise did not abuse its discretion in refusing to remand Kamanzi's case to the IJ for consideration of the two documents supporting his claim that he is not a citizen of Congo. *See Suate-Orellana v. Barr*, 979 F.3d 1056, 1062 (5th Cir. 2020). As the Government points out, the documents were published in 2003 and 2011, respectively, and both predate Kamanzi's April 22, 2019 hearing and, therefore, could have been presented to the IJ.

Based on the foregoing, the petition for review is DENIED.