# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 27, 2024

Lyle W. Cayce
Clerk

No. 23-60523

Vicente Paulo Cabuya; Esperanca Luzolo Tuvevele;
Cintia Vicente Cabuya,

*Petitioners*,

*versus*

Merrick Garland, *U.S. Attorney General*,

*Respondent*.

Petition for Review from an Order of the
Board of Immigration Appeals
Agency Nos. A205 964 598,
A205 964 599, A205 964 600

Before Dennis, Southwick, and Engelhardt, *Circuit Judges*.

Per Curiam:[*]

Petitioners Vicente Paulo Cabuya (Cabuya), his wife, Esperanca Luzolo Tuvevele (Tuvevele), and their daughter, Cintia Vicente Cabuya, are natives and citizens of Angola. They seek review of the Board of Immigration Appeals' (BIA) decision upholding the denial of asylum, withholding of removal, and protection under the Convention Against Torture (CAT). For

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

the reasons set forth below, we grant the petition as to the CAT claim and remand for further consideration of that claim alone.

## I.      Factual and Procedural Background

Cabuya's asylum journey begins at his store in Angola on August 25, 2012. Cabuya claims that protesters came to his store after attending a rally against corruption in the upcoming election. His wife, Tuvevele, was inside the store with Cabuya's daughter, who was selling drinks. For his part, Cabuya was outside with the protesters. He agreed with their attacks on President Dos Santos and offered his own criticisms and support for their cause. The next day, national information service, Serviço de Informação (SINFO), agents—one of whom Cabuya allegedly recognized from the previous day at the store—appeared at Cabuya's home and demanded he visit their offices following the August 31, 2012 election.

On September 7, Cabuya went on a business trip instead. While he was away, SINFO agents visited the store and delivered a convocation to Tuvevele, demanding that Cabuya appear at a police station on September 17. Cabuya did not return home because he believed he did nothing wrong and the convocation "had not been delivered to him personally." SINFO agents returned with a second convocation on September 20, "threaten[ing] to arrest [Tuvevele] and her children if [Cabuya] did not appear." Though Tuvevele called Cabuya and urged him to come home, he did not return until the first week of October "because he had purchased a large quantity of merchandise for the pharmacy and had to ensure its safe delivery across the border." On October 6, during a party celebrating his return, SINFO agents arrested Cabuya, imprisoned him, and treated him brutally, including (as he later disclosed) sexually assaulting him.

After obtaining release through a bribe, Cabuya and his family traveled to the United States. Cabuya submitted an application to U.S. Citizenship

and Immigration Services seeking asylum, withholding of removal, and protection under the CAT. The IJ denied relief based on an adverse credibility finding. The BIA affirmed, relying on the IJ's analysis as to the following issues:

(1) Cabuya's omission of an alleged sexual assault and discrepancies in Cabuya's testimony about whether, when, and where Cabuya told his wife about the sexual assault;

(2) Vague and evasive testimony about the August 25, 2012 post-rally event at the store;

(3) Implausible interactions with SINFO agents; and

(4) Cabuya's demeanor.

The petitioners seek review, challenging the adverse credibility determination and contending that the BIA and IJ failed to conduct an independent analysis of their claims under the CAT.

## II.　Analysis

We review the BIA's decision and consider the decision of the immigration judge (IJ) only to the extent it influenced the BIA. *Santos-Alvarado v. Barr*, 967 F.3d 428, 436 (5th Cir. 2020). Questions of law are reviewed de novo. *Avelar-Oliva v. Barr*, 954 F.3d 757, 763 (5th Cir. 2020). Factual findings, including credibility determinations, are reviewed under the substantial evidence standard. *Id.*

a. Substantial evidence supports the adverse credibility finding.

Asylum and withholding of removal often come down to credibility. "Applicants regularly tell horrific stories that, if true, show past persecution and a risk of worse to come. But these stories rarely are susceptible to documentary proof." *Wang v. Holder*, 569 F.3d 531, 539 (5th Cir. 2009)

(citation omitted). Without that proof, "much depends upon demeanor and inferences to be drawn therefrom." *Id.* Omissions, contradictions, inconsistencies, and demeanor in recounting those details may result in an adverse credibility determination. *See Santos-Alvarado*, 967 F.3d at 436 (citing 8 U.S.C. § 1158(b)(1)(B)(iii)). The adverse credibility determination "may be based on *any* inconsistency even if it does not 'go to the heart of the applicant's claim or any other relevant factor.'" *Avelar-Oliva*, 954 F.3d at 768 (emphasis added) (quoting § 1158(b)(1)(B)(iii)). In short, a "compelling story" with "sketchy" details cannot overcome an adverse credibility finding. *Wang*, 569 F.3d at 539.

Reversal of this finding is "rare" and typically done only if the "alleged discrepancies are not actual discrepancies." *Ndungmbowo v. Garland*, No. 21-60213, 2023 WL 8016701, at *4 (5th Cir. Nov. 20, 2023). Even so, a petitioner's plausible explanations for various inconsistencies will not warrant reversal "unless, from the totality of the circumstances, it is plain that no reasonable fact-finder could make such an adverse credibility ruling." *Avelar-Oliva*, 954 F.3d at 767 (citation omitted). If the BIA's adverse credibility determination is supported by substantial evidence, that is the end of the matter. *Ghotra v. Whitaker*, 912 F.3d 284, 289 (5th Cir. 2019).[1]

---

[1] The dissent suggests that *Garland v. Ming Dai*, 593 U.S. 357 (2021) permits an "mixed credibility" finding whereby a petitioner's lack of credibility as to one issue should not destroy the petitioner's credibility as a whole. But *Ming Dai* suggests just the opposite. Reviewing courts "must be mindful" that the agency "is free to credit part of [a] witness testimony without necessarily accepting it all." *Id.* at 366 (internal quotation marks and citation omitted). But "[i]t does not matter whether the agency accepts all, none, or some of the alien's testimony; its reasonable findings may not be disturbed." *Id.* "[S]o long as the record contains 'contrary evidence' of a 'kind and quality' that a reasonable factfinder could find sufficient, a reviewing court may not overturn the agency's factual determination." *Id.* (citation omitted). That sufficiency is present here.

No. 23-60523

Under this deferential standard of review, we conclude the adverse credibility determination is supported by substantial evidence. First, Cabuya omitted from his asylum application and interview a sexual assault that he claimed occurred while he was detained in Angola. As we have previously held, the omission of a significant traumatic event—such as a sexual assault—may undermine credibility, especially where the petitioner is able to speak cogently about other traumas. *Santos-Alvarado*, 967 F.3d at 438–39 (upholding adverse credibility finding where petitioner failed to "mention the assault he suffered . . . anywhere in his written application materials."); *Avelar-Oliva*, 954 F.3d at 768 (collecting cases and upholding adverse credibility finding where petitioner failed to mention details that might corroborate sexual abuse).[2] Cabuya explains that he withheld this information because he felt shame and embarrassment. While it is entirely "plausible that [Cabuya's] trauma, fear," and shame "caused the omission of these allegations," it is "also plausible that they were added to bolster the asylum application." *Meza Benitez v. Garland*, No. 19-60819, 2021 WL 4998678, at *3 (5th Cir. Oct. 27, 2021) (per curiam). Where there are "other permissible views of the evidence," the IJ and BIA are "not required to accept [Cabuya's] explanation." *Suate-Orellana v. Barr*, 979 F.3d 1056, 1061 (5th Cir. 2020).

Further supporting the adverse credibility determination, the IJ noted that Cabuya's testimony was inconsistent with Tuvevele's concerning when

---

[2] Petitioners rely on *Ndungmbowo*, 2023 WL 8016701, at *3, for the proposition that Cabuya's late disclosure is of no moment because he previously stated he "suffered torture in a very inhuman way." Petitioners' stretched reading does not comport with our published, binding cases. *See, e.g.*, *Santos-Alvarado*, 967 F.3d at 438–39; *Avelar-Oliva*, 954 F.3d at 768. Further, unlike *Ndungmbowo*, this case does not turn primarily on the late disclosure or on "alleged discrepancies [that] are not actual discrepancies." 2023 WL 8016701, at *3. Cabuya's testimony presents inconsistencies that cut to the heart of his asylum claim separate and apart from the allegations of sexual assault.

he first told her about the sexual assault. Cabuya stated he told Tuvevele "[n]ot that far ago." He could not recall the "exact date," but it was "when [he] started to get sick." Cabuya's brief and medical records indicate that Cabuya "was sick and received treatment . . . in 2013-2014 in the United States." Tuvevele, however, stated that Cabuya told her about the sexual assault "in Luanda." When pressed, she confirmed that she "kn[ew] he was sexually assaulted when [she was] in Angola, before [she] came to the United States." Petitioners parse the testimony to present an alternative interpretation. But given the competing views of the evidence, they have not shown the record compels that interpretation. *See Suate-Orellana*, 979 F.3d at 1061; *Avelar-Oliva*, 954 F.3d at 768-69.

Second, Cabuya's testimony about the August 25, 2012 event is patchy. Because Cabuya had never engaged in any political activity prior to this date, the gathering was "[t]he sole evidence on motivation of the alleged persecutor" and key to establishing Cabuya's politically-based asylum claim. Despite the event's importance, Cabuya "could not tell DHS counsel how many people were in the store at any particular point on that day, only that twenty protestors arrived at his store at 4:00 pm and a [SINFO agent], whom he recognized the next day, was at the store while he spoke to the protestors."

Crucially, Cabuya repeatedly told DHS counsel that he did not know when the SINFO agent arrived or left the store. Unable to pin down any information about the SINFO agent, DHS counsel asked, "How did you recognize this guy the day after if you don't know when he was in your store, when he was not in your store, if he was in your store?" This time, Cabuya offered, "He was there. He was drinking. He was drinking. I was there." When asked whether it was "fair to say [the SINFO agent] could have never heard one of your conversations about any political party because you don't know when he was there and when he was not there," Cabuya replied, "For that I said I don't know." In sum, Cabuya could fix the timing, duration, and

size of the protester crowd, but he could not recall any details about the SINFO agent who was the alleged source of his persecution. The failure to pinpoint details supporting the key event giving rise to his claims supports the adverse credibility finding.

Third, the IJ and BIA also concluded it was "implausible" that Cabuya left for a business trip and stayed there after two convocations from SINFO agents. The record demonstrates that Cabuya was aware that SINFO agents were "dangerous," and that failure to comply with a convocation may result in arrest. But Cabuya proceeded undeterred with his business, even after SINFO agents threatened his wife and children. Given Cabuya's awareness of potential peril, a reasonable factfinder could conclude that Cabuya's disregard of the SINFO agents and convocations before and during his trip to the DRC was implausible.[3]

Fourth, the IJ found that Cabuya's testimony "appeared to be excessively rehearsed, monotone and non-spontaneous." We find no basis to quarrel with this assessment. The asylum statute expressly states that "a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness." 8 U.S.C. § 1158(b)(1)(B)(iii). And we are especially deferential to an IJ's assessment in this regard because appellate courts are "not in a position to judge [the petitioner's] demeanor." *Wang*, 569 F.3d at 540; *see also Ewongkem v. Holder*, 535 F. App'x 381, 384 (5th Cir. 2013) (per curiam) (The IJ's "experience [with] these difficult

---

[3] The BIA indicates that Cabuya left for the business trip on August 31, 2012. In reality, he left on September 7, seven days after he was supposed to meet with the SINFO agents. The correct date does not cure the implausibility of departing for a trip without complying with the initial SINFO request and remaining there after his wife received two convocations on his behalf, one of which was joined with threats to his family.

credibility determinations" places the IJ in the "best position to assess [a petitioner's] demeanor.").

Moreover, neither the record nor petitioners provide sufficient grounds to question this finding. As already explained, Cabuya's answers were vague and unresponsive. Cabuya said, "I don't know," repeatedly throughout his testimony. And the petitioners have not shown that the IJ failed to take into account the effects of a language barrier, interpreter, and Cabuya's mental health conditions that might undermine this determination.

It bears repeating that Cabuya's allegations, if true, are horrific. But when it comes to truth, "our court does not substitute its judgment for that of the BIA or the IJ with respect to the credibility of witnesses and the ultimate findings based on credibility determinations." *Yan Bing Lin v. Ashcroft*, 110 F. App'x 410, 411 (5th Cir. 2004) (per curiam). The IJ and BIA specifically identified inconsistencies and implausibilities that support their adverse credibility determination. Because we cannot say that "no reasonable fact-finder could have made an adverse credibility determination," we must uphold the adverse credibility finding. *Singh v. Sessions*, 880 F.3d 220, 226 (5th Cir. 2018).

Without Cabuya's testimony, the petitioners fail to meet the standards for asylum and withholding of removal. *See Santos-Alvarado*, 967 F.3d at 436.

b. <u>The IJ and BIA must consider nontestimonial evidence of torture.</u>

A CAT claim "is separate from the claims for asylum and withholding of removal and should receive separate analytical attention." *Efe v. Ashcroft*, 293 F.3d 899, 906-07 (5th Cir. 2002). The petitioners argue that the IJ and BIA erred in denying protection under the CAT based solely on the adverse credibility determination without considering their other evidence, such as

country reports discussing human rights abuses in Angola and state-sponsored violence against political demonstrators. We agree.

To qualify for CAT relief, the applicant must establish "that it is more likely than not" that he "would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). CAT regulations require the BIA to consider nontestimonial evidence, such as country-conditions reports, in its likelihood-of-torture analysis. *See* § 1208.16(c)(3). There is "no exception for cases of adverse credibility determinations." *Arulnanthy v. Garland*, 17 F.4th 586, 598 (5th Cir. 2021). Thus, where the applicant offers evidence which may independently entitle him to CAT protection, "an adverse credibility finding alone cannot defeat [his] eligibility for relief." *Ndifon v. Garland*, 49 F.4th 986, 989 (5th Cir. 2022). Petitioners pointed to documentary evidence of torture separate and apart from their testimony, none of which the IJ or BIA appeared to consider. The apparent failure to consider that evidence warrants remand. *See Ndifon*, 49 F.4th at 989.

As we have cautioned before, remand is no indicator of success on the merits. *See Arulnanthy*, 17 F.4th at 598. The evidence petitioners offer must establish a probability that *Cabuya* will be subjected to torture in Angola. *See* § 1208.16(c)(2). Generalized evidence will not do. *See Qorane v. Barr*, 919 F.3d 904, 911 (5th Cir. 2019) ("Generalized country evidence tells us little about the likelihood state actors will torture any particular person[.]"). But whether petitioners' evidence clears this threshold is not before us. That determination must be made by the BIA in the first instance.

Accordingly, we REMAND the petition as to the CAT claim and DENY it in all other respects.

No. 23-60523

James L. Dennis, *Circuit Judge*, concurring in part and dissenting in part:

I concur in the majority's decision to grant Cabuya's petition for review as to his Convention Against Torture (CAT) claim because the Board of Immigration Appeals (BIA) ignored documentary evidence tending to establish a probability that Cabuya will be subjected to torture in Angola on account of his political opinion. *Ante*, at 9 (majority opinion). I disagree, however, with the majority's denial of the petition as to his asylum and withholding of removal claims because its conclusion is based on the faulty ground that substantial evidence supported the agency's adverse credibility determination. *Id.* at 4–8. The BIA's adverse credibility determination analysis is riddled with factual errors and fails to consider the totality of the circumstances as required by 8 U.S.C. § 1158(b)(1)(B)(iii). I respectfully dissent in part.

\* \* \*

The immigration judge (IJ) makes credibility determinations by considering "the totality of the circumstances, and all relevant factors . . . without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." *Wang v. Holder*, 569 F.3d 531, 539 (5th Cir. 2009) (citing *Lin v. Mukasey*, 534 F.3d 162, 167 (2d Cir. 2008) (clarifying the appropriate basis for an adverse credibility determination)). Any credibility determination, thus, must be made in light of the totality of the circumstances, not just perceived inconsistencies in a vacuum. *See* § 1158(b)(1)(B)(iii). The BIA reviews the IJ's findings of fact, including the determination of credibility, for clear error. 8 C.F.R. § 1003.1(d)(3)(i).

The BIA relied on five purported inconsistencies in affirming the IJ's adverse credibility finding: (1) Cabuya's "omission" of a sexual assault during his detention; (2) discrepancies in Cabuya's testimony about whether, when, and where Cabuya told his wife about the sexual assault; (3) vague

10

testimony about the events at his store on the day of the protest; (4) the timing of his business trip to the Democratic Republic of the Congo (DRC); and (5) Cabuya's "excessively rehearsed, monotone, and non-spontaneous" demeanor. Each of these alleged inconsistencies is based on an erroneous reading of the record.

*First*, because his asylum application reports "suffer[ing] torture in a very inhuman way," Cabuya's description reasonably includes being sexually assaulted. During a hearing on his application before the IJ, Cabuya testified that on the first day of his detention by Serviço de Informação (SINFO) agents, jail guards brought him to a room filled with at least ten officers. The guards dropped Cabuya to the floor, poured water on him, and sexually assaulted him through forced anal penetration. While several guards sexually assaulted him, they taunted Cabuya about his political beliefs and threatened that "[w]hoever come[s] against [the] President [of Angola] will be killed." Cabuya also detailed how the guards beat him with fists, cords, firearms, and boots; stabbed him with a bayonet; and subsequently denied him medical care for his injuries. Cabuya acknowledged that he did not specifically mention the sexual assault in his asylum application or during his initial interview with an asylum officer, but his application did state that he had "suffered torture in a very inhuman way." The BIA found that Cabuya's failure to report earlier and in excruciating detail the circumstances of the sexual assault was an inconsistency that supported the IJ's adverse credibility finding.

I respectfully but emphatically disagree. As a panel of this court has observed, the failure to detail an "attempted rape specifically does not support an inconsistency because [a petitioner is] not required to detail with specificity every act of torture he endured." *Ndungmbowo v. Garland*, No. 21-60213, 2023 WL 8016701, at *3 (5th Cir. Nov. 20, 2023). Forced anal penetration perpetrated by guards during detention is "torture in an inhuman way," as Cabuya disclosed in his initial application for asylum. His testimony

is consistent with his application for asylum,[1] and the majority's contrary conclusion is error. *Ante*, at 5. One need not think long before realizing why our court has declined to ding a petitioner's credibility for failing to report the details of a traumatic sexual assault at the first available opportunity. *Ndungmbowo*, 2023 WL 8016701, at *3. That an asylum applicant who has suffered sexual abuse at the hands of government officials in their country of origin does not spontaneously reveal to the U.S. government the details of that abuse at the first opportunity does not constitute an inconsistency from which it could reasonably be inferred that he or she is lying. "Indeed, the assumption that the timing of a victim's disclosure of sexual assault is a bellwether of truth is belied by the reality that there is often delayed reporting of sexual abuse." *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1053, 1053 n.3 (9th Cir. 2002) (citing David P. Bryden & Sonja Lengnick, *Rape in the Criminal Justice System*, 87 J. Crim. L. & Criminology 1194, 1221 (1997) (discussing underreporting of sexual abuse, noting that "[s]ome rape victims are too upset, or too embarrassed at the prospect of answering a stranger's intimate questions about the incident, or so ashamed that they do not want anyone, even their friends, to know about it.")). Two circuits, accordingly, have explicitly recognized that failure to reveal a sexual assault at the first opportunity does not compromise a petitioner's credibility. *See, e.g.*, *Kebede*

---

[1] While I would simply hold that the adverse credibility finding is unsupported by the record, there is authority holding that a mixed credibility finding is permissible. *See Garland v. Ming Dai*, 593 U.S. 357 (2021) (holding that an "agency, like any reasonable factfinder, is free to 'credit part of [a] witness' testimony without' necessarily 'accepting it all'") (citing *Banks v. Chicago Grain Trimmers Assn., Inc.*, 390 U.S. 459, 467 (1968)); *see also Ayala-Osegueda v. Garland*, 92 F.4th 220 (4th Cir. 2024). Even assuming the BIA correctly found him not credible regarding the sexual assault, that should not destroy his credibility as a whole.

*v. Ashcroft*, 366 F.3d 808, 811 (9th Cir. 2004) ("A victim of sexual assault does not irredeemably compromise his or her credibility by failing to report the assault at the first opportunity."); *Juarez-Lopez v. Gonzales*, 235 F. App'x 361, 366 (7th Cir. 2007) (concluding that an adverse credibility finding should not be based on an applicant's "understandable reluctance to divulge information about her rapes"); *Clemente-Giron v. Holder*, 556 F.3d 658, 664 (8th Cir. 2009) (Wollman, J., dissenting) ("The United Nations, the INS, and the Ninth and Seventh Circuits all recognize the impact sexual assault can have on a victim's ability to disclose [their] abuse and that such reluctance should not weigh against credibility."). Our circuit has done so implicitly. *Ndungmbowo*, 2023 WL 8016701, at *3. In light of these precepts, it was unreasonable for the BIA to reject Cabuya's explanation that he failed to immediately report the details of his sexual assault "because he felt shame and embarrassment." *Ante*, at 5. And more to the point, there was no inconsistency between his asylum application and his testimony before the IJ. *Ndungmbowo*, 2023 WL 8016701, at *4 (recognizing that we should reverse an adverse credibility determination "if the 'alleged discrepancies are not actual discrepancies'").

*Second*, rather than relying on Cabuya's testimony and the corroborating evidence he presented, the BIA and the majority rely on a manufactured inconsistency between Cabuya and Tuvevele's testimony about *when* Cabuya told his wife he was sexually assaulted. *Ante*, at 6. The BIA and the majority claim that Cabuya testified he told his wife, Tuveleve, about the sexual assault in the United States, but that his wife testified that Cabuya told her about it before they fled from Angola. When considering the testimony as a whole, it does not reveal an inconsistency. For starters, Cabuya testified he "did not know the exact date" when he confided in his wife about the sexual assault but guessed that he probably told her by the time

he "started to get sick." The BIA inferred from Cabuya's medical records[2] that his testimony meant Cabuya and his wife were in the United States when he told her about the sexual assault. Tuvevele, when asked "has your husband ever told you that he was sexually assaulted *in Angola*?" responded, "Yes, he told me that." The majority points to Tuvevele's testimony that she could tell, upon Cabuya's release from the detention facility, that he had probably been sexually abused because "he couldn't sit normally," as evidence of an inconsistency. *Ante*, at 6. That testimony says nothing about when Cabuya *told* his wife he was sexually assaulted, only that she *suspected* that he had been sexually assaulted as soon as she saw him. Reading her testimony in full, she later says that "I knew, but I-it was as if I didn't know," further bolstering this interpretation and emphasizing that she suspected he had been sexually assaulted based on his behavior and demeanor. The BIA and the majority erroneously conflate the distinction between when she suspected her husband had been sexually assaulted and when Cabuya told her that he had been sexually abused. "[P]ars[ing] the testimony" carefully—as courts of review are in the business of doing—I would find no inconsistency between Cabuya and Tuvevele's testimony about when Cabuya told his wife he was sexually assaulted.[3] *Id.*

*Third*, the record refutes the majority and BIA's assertion that Cabuya's testimony about the gathering of protestors at his store on the day

---

[2] Cabuya's medical records reflect that he suffered an illness in the United States.

[3] Even if there was an arguable inconsistency here, I would find this by itself is not enough to support an adverse credibility determination in light of the totality of the circumstances. The "inconsistency" sources from Cabuya admitting he "did not know the exact date" when he confided in his wife about the sexual assault. When considering the totality of the circumstances and the fact that neither party disputes the sexual assault actually occurred, the fact that Cabuya was unsure about the exact date he confided in his wife cannot support an adverse credibility finding. *Ndungmbowo*, 2023 WL 8016701, at *2.

of the protest was "patchy." *Ante*, at 6. The BIA reasoned that Cabuya's ability to identify a SINFO agent as being present on the day of the protest was implausible given that he was generally unable to provide the identities of other people in the store, including "how many customers were in the store that morning, how many people were there when the protestors arrived, [and] how many people were there when the protestors left." The IJ inaccurately portrayed Cabuya's testimony. Cabuya was never asked how many customers were in the store that morning and, in any event, the evidence indicates that he was not at the store the morning of the protest until the protest ended because he was working his second job at the pharmacy. Cabuya also was never asked how many people were at the store when the protestors left. Further, far from being "unable to provide information on any other individuals in the store," Cabuya testified that he recognized three other people from his neighborhood and identified them by name. Cabuya specifically testified that he recognized one SINFO agent who came to his house the day after the protest because he had seen the agent drinking in the store the day before and recognized his face. Neither the IJ nor the majority explain how recognizing the agent as having been in his store after the protest is implausible, especially when considering the fact that Cabuya was also able to recognize and name several other people who were at his store. Given the patent defects in the BIA's reasoning, Cabuya's testimony about the day of the protest does not support the adverse credibility finding.

*Fourth*, in reliance on misinformation, the BIA upheld the IJ's finding that it was implausible that Cabuya would not postpone his business trip to purchase merchandise for the pharmacy and that it was unlikely that Cabuya would have remained in the DRC despite repeated convocations to appear. Both the BIA and the IJ erred by stating that Cabuya left for his business trip

to the DRC on August 31, 2012, when in fact, he left on September 7.[4] *Reyes-Hoyes v. Garland*, No. 20-60133, 2023 WL 3075064, at *5 (5th Cir. Apr. 25, 2023) (finding that the BIA procedurally errs when it "misstate[s] the record"). The fact that the BIA and IJ found the timing of the trip to be suspicious is certainly undercut by their failure to accurately recount when the trip began. The majority finds that "[t]he correct date does not cure the implausibility of departing for the trip [to the DRC] without complying with the initial SINFO request and remaining there after his wife received two convocations on his behalf, one of which was joined with threats to his family." *Ante*, at 7 n.3. At the same time, however, the majority relies upon Cabuya's testimony acknowledging how dangerous the SINFO agents were. *Id.* Taking Cabuya's awareness of the danger the SINFO agents together with the correct date strengthens the conclusion that the trip was not suspicious timing, as he remained over a week after the first convocation. *See* § 1158(b)(1)(B)(iii) (imposing a requirement to consider the totality of the circumstances). Mistakes happen, but using the incorrect date when assessing a petitioner's eligibility for asylum and simultaneously scouring every word of the petitioner's testimony for a purported inconsistency to base a denial of relief on is unacceptable. *Mpesse v. Garland*, No. 20-61207, 2021 WL 4256177, at *5 (5th Cir. Sept. 17, 2021) (granting a petition for review and remanding for a reevaluation of a petitioner's credibility where "the IJ erred in some of the evidence he relied on to find that the petitioner was not credible"). Cabuya immigrated to the United States to escape violent persecution by the Angolan government; it is circular to base an adverse credibility determination on the so called "implausibility" of departing for a

---

[4] The IJ's decision correctly stated Cabuya's travel dates when summarizing the facts but later misstated the departure date in the credibility analysis.

work trip to the DRC at the same time dangerous agents of Angola's government were expecting him to meet them at a police station.

And *fifth*, the BIA relied on the IJ's finding that Cabuya's testimony "appeared to be excessively rehearsed, monotone and non-spontaneous." That alone is not enough to support an adverse credibility determination, and I would expect an applicant facing the prospect of torture, in the event he was denied asylum, to show up to an important immigration hearing well-prepared but nervous, which, admittedly, might come across as being "rehearsed." While the majority is correct that the statute permits "a trier of fact [to] base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness," *see* § 1158(b)(1)(B)(iii), our court has never held that a "rehearsed" demeanor, on its own, supports an adverse credibility ruling. *See Ndudzi v. Garland*, No. 20-60782, 2022 WL 9185369, at *5 (5th Cir. Oct. 31, 2022) (first citing *In re A-S-*, 21 I. & N. Dec. 1106, 1112 (BIA 1998) (suggesting that it may be inappropriate to base an adverse credibility finding solely on "halting and hesitating testimony" if that testimony is detailed and consistent); and then citing *In Re B-*, 21 I. & N. Dec. 66, 70 (BIA 1995) (reversing denial of asylum that was based solely on demeanor)). Because I would limit the valid inconsistencies that the BIA relied on in making its adverse credibility determination to include only Cabuya's demeanor, the appropriate remedy is vacatur and remand "for a reevaluation of petitioner's credibility." *Mpesse*, 2021 WL 4256177, at *1.

All told, "[a]lthough it is a rare case in which we reverse an adverse credibility determination, we have done so when the alleged discrepancies are not actual discrepancies." *Ndungmbowo*, 2023 WL 8016701, at *4 (first citing *Nkenglefac v. Garland*, 34 F.4th 422, 430 (5th Cir. 2022) (reversing adverse credibility determination when not supported on a review of the record); and then citing *Ndudzi*, 2022 WL 9185369, at *5 (same)); *see also Mwembie v. Gonzales*, 443 F.3d 405, 410–12 (5th Cir. 2006) (same). This is

another one of those cases. As a court of review, we have an obligation to do more than rubber stamp the BIA's decision when the BIA mischaracterizes testimony, makes mistakes in its analysis, and fails to consider the totality of the circumstances as required by statute. *See Wang*, 569 F.3d at 537 ("[A]n adverse credibility determination still 'must be supported by specific and cogent reasons *derived from the record*.'" (quoting *Zhang v. Gonzales*, 432 F.3d 339, 344 (5th Cir. 2005)) (emphasis added)). Because the majority mistakenly approves the BIA's decision despite its many errors, I respectfully dissent from the denial of Cabuya's petition as to the asylum and withholding of removal claims.